**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| v. | ) | 06-02167 (JDB) |
| | ) | |
| ALLIED PROFESSIONAL SERVICES, INC a/k/a Allied Services | ) ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR ENTRY OF DEFAULT JUDGMENT

Plaintiff, the International Painters and Allied Trades Union Industry Pension Fund

("Pension Fund" or "Plaintiff"), respectfully moves this Court for entry of judgment by default

against Defendant, Allied Professional Services, Inc. a/k/a Allied Services ("Defendant"), in the

amount of $6,226.28 which includes contributions due for the month May 2002 and the period

July 2002 through December 2002, interest, liquidated damages and attorneys' fees and costs

incurred by the Pension Fund pursuant to 29 U.S.C. §185(a) and 1132(g)(2)(A) through (D), and

for injunctive relief.

In support of this Motion, Plaintiff relies upon the allegations in its Complaint, the

Declaration of Thomas Montemore[1] and the Declaration of Sanford G. Rosenthal.[2]

The grounds for this Motion are as follows:

1.      Prior to the commencement of this action, the Plaintiff attempted to resolve this

delinquency in an amicable manner.

---

[1]      The Declaration of Thomas Montemore ("Montemore Declaration") is attached to this Motion as Exhibit 1. The exhibit referenced in the Montemore Declaration (Labor Contract) is attached as Exhibit 2.

[2]      The Declaration of Sanford G. Rosenthal ("Rosenthal Declaration") is attached to this Motion as Exhibit 3. The exhibit referenced in the Rosenthal Declaration is attached to this Motion as Exhibit 4.

179854-1

2.    The requested payments were not received and the Complaint in this matter was filed on December 19, 2006. The Complaint was served on Defendant on January 6, 2007 as appears from the Affidavit of Service duly filed with the Court.

3.    No Answer to the Complaint has been filed by Defendant.

4.    On January 31, 2007, Plaintiff filed a Request to Clerk to Enter Default against Defendant pursuant to Fed. R Civ. P. 55(a). A copy was sent via first-class mail, postage prepaid, to Defendant.

5.    On February 1, 2007, the Clerk of the Court entered default against Defendant.

6.    Defendant is neither an infant nor incompetent person.

**WHEREFORE**, Plaintiff seeks the following relief:

(a)    Judgment entered as set forth in the proposed Order and Judgment attached to this Motion;

(b)    Such other and further relief as the Court deems just, necessary and appropriate.

Respectfully submitted,

JENNINGS SIGMOND, P.C.

BY: /s/ Sanford G. Rosenthal
SANFORD G. ROSENTHAL
Bar No. 478737
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0611
Attorney for the Fund

Date: February 16, 2007
OF COUNSEL:
Elizabeth A. Coleman
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0644

179854-1                                       2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL PAINTERS AND ALLIED    )
TRADES INDUSTRY PENSION FUND       )
                                        )
                   Plaintiff,        )      CIVIL ACTION NO.
     v.                         )      06-02167 (JDB)
                                          )
ALLIED PROFESSIONAL SERVICES, INC     )
   a/k/a Allied Services                  )
                                        )
               Defendants.      )

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT BY DEFAULT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 55(b) AGAINST DEFENDANT.

Plaintiff, the International Painters and Allied Trades Union Industry Pension Fund ("Pension Fund" or "Plaintiff"), by its legal counsel, submits this Memorandum of Law in Support of its Motion for Judgment by Default.[1]

The Plaintiff served its Complaint on Defendant, Allied Professional Services, Inc. a/k/a Allied Services ("Defendant"), on January 6, 2007. To date, Defendant has failed to answer the Complaint or otherwise defend this action. On January 31, 2007, Plaintiff filed a Request For Entry of Default against Defendant pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. The default was entered against Defendant on or about February 1, 2007.

In light of Defendant's default and Defendant's continuing failure to appear or otherwise defend, the Pension Fund is entitled to judgment by default against Defendant without a hearing. Fed. R. Civ. P. 55(b); United States v. De Frantz, 708 F. 2d 310 (7th Cir. 1983); Draisner v. Liss Realty, 211 F. 2d 808 (1954). Moreover, where a defendant, such as the one here, fails to

---

[1]     Attached to the Motion accompanying this Memorandum are the Declarations of Thomas Montemore ("Montemore Declaration") and Sanford G. Rosenthal ("Rosenthal Declaration"). Also attached is a proposed form of Default Judgment.

179854-1

respond to the Complaint, all factual allegations in the Complaint are deemed admitted.

Thomson v. Wooster, 114 U.S. 104 (1885); Au Bon Pain Corp. v. Artect, Inc., 653 F 2d 61 (2d

Cir. 1981); U.S. ex. Rel. v. Carr, 567 F. Supp. 831, 840 (W.D. MI 1983). General allegations of

fact are also deemed true. Danning v. Lavin, 572 F. 2d 1386, 1388-89 (9th Cir. 1978)

(allegations of insolvency pled in general terms held sufficient to support a finding of fraudulent

conveyance or voidable preference).

Defendant is and has been party to collective bargaining agreements (singly or jointly

"Labor Contract") with the various local unions and district councils affiliated with the

International Union of Painters and Allied Trades, AFL-CIO-CFC ("International" or "Union").

See, Exhibit 1, Montemore Declaration, ¶5; Exhibit 2, a true and correct copy of relevant

provisions from the Labor Contract. Under the Labor Contract, Defendant is required to remit

fringe benefit contributions and other sums to Plaintiff. See, Exhibit 1, Montemore Declaration,

¶6; Exhibit 2, Labor Contract, at Art. XVII. The failure to pay these fringe benefit contributions

and other amounts results in a delinquency to the Plaintiff.

## ARGUMENT

### A.    ENTRY OF JUDGMENT AGAINST DEFENDANT FOR UNPAID CONTRIBUTIONS, INTEREST, LIQUIDATED DAMAGES AND ATTORNEYS' FEES AND COSTS IS ENTIRELY APPROPRIATE

Defendant is a party to a Labor Contract with the Union. See, Exhibit 1, Montemore

Declaration, ¶5; Exhibit 2, Labor Contract. The Labor Contract provides for the payment of

contributions to the Pension Fund for time worked by or paid to employees who perform work

covered by its terms and conditions. See, Exhibit 1, Montemore Declaration, ¶6; Exhibit 2, Labor

Contract, at Art. XVII. Failure to make these contributions, or to submit either incorrect or late

remittance reports, results in a delinquency to the Pension Fund. Ibid. Under the Labor Contract,

the Pension Fund also has the right to audit the signatory's payroll books and related records to

determine that all of the required contributions have been paid. See, Exhibit 2, Labor Contract, at

Art. XVII; Complaint, Exh. 1, Art. VI, Sec. 6. Finally, under the terms of the Labor Contract, the

employer agrees to be bound by the Agreement and Declaration of Trust of the Pension Fund

("Trust Agreement," attached as Exhibit 1 to the Complaint filed in this matter and incorporated

by reference) and the International Painters and Allied Trades Industry Pension Plan ("Plan,"

attached as Exhibit 2 to the Complaint filed in this matter and incorporated by reference) and by

all amendments thereto and actions taken by the trustees of the Pension Fund. See, Complaint, ¶¶

5-7; Exhibit 1, Montemore Declaration, ¶ 5; Exhibit 2, Labor Contract, at Art. XVII.

Furthermore, Section 515 of the Employee Retirement Income Security Act ("ERISA"),

29 U.S.C. §1145, provides:

> Every Employer who is obligated to make contributions to a
> bargained agreement shall ... make contributions in accordance
> with ... such agreement.

If an employer fails to make the contributions as required by the collective bargaining

agreement and Section 515 of ERISA, then the employer is subject to the provisions of Section

502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2). Section 502(g)(2) provides for the mandatory

award of the following if a judgment is entered in the Pension Fund's favor pursuant to Section

515:

A.    the unpaid contributions;

B.    interest on the unpaid contributions;[2]

C.    an amount equal to the greater of:

---

[2]    Section 10.12(b)(2) of the Plan sets the interest rate on delinquent contributions according to the Internal Revenue Service rate for delinquent taxes. See, Complaint, Exhibit 2.

           (i)      interest on the unpaid contributions; or

           (ii)     liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the Court under subparagraph (a);[3]

D.     reasonable attorneys' fees and costs of the action, to be paid by the Defendant; and

E.     such other legal or equitable relief as the court deems appropriate.

As stated above, Defendant has failed to submit contributions and/or remittance reports for the month May 2002 and the period July 2002 through December 2002. See, Exhibit 1, Montemore Declaration, ¶7. As a result, Plaintiff is entitled to judgment in at least the amount of $6,226.28.

## 1.    **Defendant owes contributions in at least the amount of $2,770.00**

Defendant has failed to submit the required contributions for the month of May 2002 and the period of July 2002 through December 2002 in the total amount of $2,770.00. See Exhibit 1, Montemore Declaration, ¶7.  Therefore, Defendant owes a total of at least $2,770.00 in delinquent contributions.

## 2.    **Defendant owes interest in the amount of $687.87**

The rules and regulations as set forth in §10.12(b)(2) of the Plan set the interest rate on delinquent contributions according to the Internal Revenue Service rate for delinquent taxes. Interest accruing through February 15, 2007 on Defendant's delinquent contributions totals

---

[3]     ERISA and §10.12(b)(3) of the Plan's rules and regulations mandate that liquidated damages be awarded in an amount equal to the greater of interest or twenty percent (20%) of unpaid contributions due at the commencement of the lawsuit and those which become delinquent during the course of the litigation. See, Complaint, Exhibit 2. Article VI, Sec. 4 of the Trust Agreement also provides for the assessment of liquidated damages on contributions paid after the due date. See, Complaint, Exhibit 1.

$687.87. <u>See</u>, Exhibit 1, Montemore Declaration, ¶8; 29 U.S.C. §1132(g)(2)(B); 26 U.S.C.

§6621. Interest will continue to accrue until the amounts are paid.

### 3.    **Defendant owes liquidated damages in the amount of $687.87**

ERISA and §10.12(b)(3) of the Plan's rules and regulations mandate that liquidated

damages be awarded in an amount equal to the greater of interest or twenty percent (20%) of

unpaid contributions due at the commencement of the lawsuit and those which become

delinquent during the course of the litigation. Article VI, Sec. 4 of the Pension Fund's Trust

Agreement also provides for the assessment of liquidated damages on contributions paid after the

due date. Twenty percent (20%) of Defendant's unpaid contributions is $554.00. The amount of

interest ($687.87) is greater than twenty percent (20%) of the unpaid contributions ($554.00).

Therefore, Defendant owes $687.87 in liquidated damages. <u>See</u>, Exhibit 1, Montemore

Declaration, ¶9; 29 U.S.C. §1132(g)(2)(C).

### 4.    **Defendant owes attorneys' fees in the amount of $2,080.54**

Plaintiff has incurred $2,080.54 in attorneys' fees and costs in connection with this matter

through February 14, 2007. <u>See</u>, Exhibit 3, Rosenthal Declaration, ¶2; Exhibit 4. <u>See</u>, 29 U.S.C.

§1132(g)(2). The Pension Fund is entitled to reimbursement of all attorneys' fees and costs it

incurs in connection with the enforcement and collection of any judgment entered by the Court.

<u>See</u>, <u>International Painters and Allied Trades Industry Pension Fund v. H.W. Ellis Painting Co.,</u>

<u>Inc.</u>, No. 03-1125, slip. op. at *3 (D.D.C. February 10, 2004) (citing <u>Free v. Briody</u>, 793 F.2d

807 (7th Cir. 1986); <u>Trucking Employees of North Jersey Welfare Fund, Inc. v. Bellezza Co.</u>, 57

Fed. Appx. 972 (3d Cir. 2003); <u>Sheet Metal Workers Health and Welfare Trust Fund v. Big D</u>

<u>Service Co.</u>, 867 F.2d 852 (10th Cir. 1989)). Therefore, Defendant owes $2,080.54 in attorneys'

fees and costs.

5.     **The Pension Fund is entitled to injunctive relief**

The failure of Defendant to comply with its contractual and statutory obligations results in a substantial adverse impact on the Pension Fund's ability to meet its legal obligations. The Pension Fund is obligated by express mandates of ERISA and by the documents and instruments by which it is administered to provide benefits and pension credits to all of Company's employees who are otherwise eligible to receive them. 29 C.F.R. 2530-200b-2(a)(1) and (2); Central States, S.E. & S.W. Areas Pension Fund v. Admiral Merchants Motor Freight, Inc., 511 F.Supp. 38 (D.Minn. 1980), aff'd sub. nom., Central States, S.E. & S.W. Areas Pension Fund v. Jack Cole-Dixie Highway Co., Inc., 642 F.2d 1122 (8th Cir. 1981). The Pension Fund is required to provide these benefits and credits regardless of whether Defendant makes the contributions. For example, if employees perform work covered by the collective bargaining agreement, the Pension Fund has affirmative obligations to credit hours for retirement benefits regardless of whether a signatory employer makes contributions to the Pension Fund. The result of Company's non-compliance with ERISA and the Labor Contract is a significant drain on the Pension Fund's resources.

Additionally, where, as here, Defendant fails to remit its contributions, the Pension Fund loses the income that it would have earned by investing those contributions. Combining this loss of investment income with the Pension Fund's requirement to continue paying benefits to Company's employees (as well as to the employees of other signatory contractors) will eventually affect the actuarial soundness of the Pension Fund as well as deplete the resources available to pay current pension benefits.

Furthermore, the Pension Fund incurs additional administrative expenses as a result of Defendant's failure to pay its contributions. These losses and added expenses significantly

impair the Pension Fund's ability to continue to provide benefits to not only Company's employees, but also to employees of companies that comply with their contractual obligations. In light of Defendant's failure to comply with its contractual and statutory obligations to the Pension Fund to submit timely, accurate remittance reports and pension contributions each month, and the irreparable harm which Defendant's malfeasance causes the Pension Fund, the Pension Fund respectfully requests the injunctive relief which is set forth in its proposed default judgment. Laborers' Fringe Benefit Funds v. Northwest Concrete, 640 F.2d 1350, 1352 (6th Cir. 1981); IBPAT Union and Industry Pension Fund v. Hartline-Thomas, Inc. , 4 EBC 1199, 1200 (D.D.C. 1983); Teamsters Local 639 - Employers Trust v. Jones & Artis Construction Co., 640 F.Supp. 223 (D.D.C. 1986).

**B.    DEFENDANT SHOULD BE ORDERED TO PRODUCE THE APPROPRIATE RECORDS TO ALLOW THE PENSION FUND TO AUDIT ITS PAYROLL BOOKS AND RELATED RECORDS AND MUST PAY ANY ADDITIONAL AMOUNTS FOUND TO BE DUE AND OWING**

The determination of an employee's eligibility for benefits is made based upon information contained in the remittance report, to be filed monthly by each and every signatory employer. A proper determination of eligibility is not possible if remittance reports are not submitted or if they contain incorrect information. See, 29 U.S.C. §1132(g)(2)(E) (equitable relief); Teamsters Local 639 – Employers Trust v. Jones & Artis Construction Co., 640 F. Supp.223 (D.D.C. 1986); IBPAT Union and Industry Pension Fund v. Hartline – Thomas, Inc., 4 EBC 1199, 1200 (D.D.C. 1983); Laborers' Fringe Benefit Pension Fund v. Northwest Concrete, 640 F. 2d 1350, 1352 (6th Cir. 1981).

In order to determine whether the contributing employer has made all required contributions and correctly reported hours worked and paid to its employees, the Pension Fund has the right to review all of the employer's records that relate to its contributory obligation.

179854-1                                                    7

Central States, S.E. & S.W. Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 105 S.Ct. 2833 (1985). The employer has the obligation to maintain appropriate records and to permit the Pension Fund's auditors to review those records upon request. Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc., 30 F.3d 692, 695 (6th Cir. 1994).

In the present case, the Labor Contract and Trust Agreement obligate Defendant to allow the audit. See Exhibit 2, Labor Contract, Art. XVII; Complaint, Exhibit 1, Art. VI, Sec. 6. The scope of records subject to review is broad, and include those records the auditors reasonably deem necessary to conduct an audit. DeMarco v. C & L Masonry, 891 F.2d 1236 (6th Cir. 1989); See also Exhibit 1, Montemore Declaration, ¶10. In addition to the routine payroll records (e.g., time cards, cancelled payroll checks, payroll ledgers and payroll tax returns), they can include the general check registers and cancelled checks, general disbursements ledgers and federal and state corporate income tax returns. Ibid.

An audit is necessary in this case in order to determine the exact amount due to the Pension Fund because of Defendant's failure to submit contractually-required remittance reports and furthermore, to ensure that the remittance reports submitted by Defendant are correct. See Exhibit 1, Montemore Declaration, at ¶¶7, 10. The Defendant's obligations under the Agreement and 29 U.S.C. § 1145 mean nothing if the Pension Fund cannot ensure compliance through an audit. The Court should order Defendant to produce its records for an audit for all periods in which the Defendant is obligated to make contributions to the Pension Fund so that a precise determination of the amount owed can be made. Upon completion of the audit, the Court should enter a further judgment against Defendant for all additional amounts found to be due and owing under the Agreement and ERISA.

## **CONCLUSION**

Plaintiff, therefore, requests that the Court enter a judgment against Defendant in the amount of $6,226.28, which includes $2,080.54 in attorneys' fees and costs, order Defendant to submit the remittance reports and corresponding contributions together with interest and liquidated damages for the month May 2002 and the period July 2002 through December 2002 and order Defendant to produce its payroll books and related records for an audit for all periods in which the Defendant is obligated to make fringe benefit contributions to the Pension Fund.

In light of the clear statutory intent of ERISA, it is respectfully requested that this Court grant the Pension Fund the relief requested in the Motion for Default Judgment.

Respectfully submitted,

JENNINGS SIGMOND, P.C.

BY: ___/s/ Sanford G. Rosenthal_____
SANFORD G. ROSENTHAL
Bar No. 478737
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0611
Attorney for the Fund

Date: February 16, 2007

OF COUNSEL:
Elizabeth A. Coleman
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0644

179854-1

9

## CERTIFICATE OF SERVICE

I, SANFORD G. ROSENTHAL, ESQUIRE, state, under penalty of perjury, that the

foregoing Motion for Judgment by Default by the Court pursuant to Federal Rule of Civil

Procedure 55(b)(2) against Defendant was served by mailing same first class mail, postage

prepaid, on the date listed below to:

Allied Professional Services, Inc.
3709 Center Street
Des Moines, IA 50312

s/ Sanford G. Rosenthal
SANFORD G. ROSENTHAL, ESQUIRE

Date: February 16, 2007

**THIS DOCUMENT HAS BEEN ELECTRONICALLY FILED AND IS AVAILABLE FOR VIEWING AND DOWNLOADING FROM THE ECF SYSTEM**

179854-1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND | ) ) ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| v. | ) | 06-02167 (JDB) |
| | ) | |
| ALLIED PROFESSIONAL SERVICES, INC a/k/a Allied Services | ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND JUDGMENT BY DEFAULT AGAINST DEFENDANT

Upon consideration of the Complaint and Plaintiff's Motion for Entry of Judgment by

Default, the supporting Memorandum, declarations and attached Exhibits, it appears to the Court

that Defendant was served with process and has inexcusably, knowingly and willfully failed to

appear, plead or otherwise defend, and the default against said Defendant having been entered,

the Court **FINDS:**

A.    Defendant, Allied Professional Services, Inc. a/k/a Allied Services ("Defendant")

is bound to a collective bargaining agreement requiring it to remit fringe benefit contributions

and other sums to Plaintiff.

B.    Defendant has failed to remit to Plaintiff the fringe benefit contributions and

other sums required by the collective bargaining agreement.

C.    The unpaid contributions due and owing by Defendant to Plaintiff are plan assets.

Consistent with these findings, it is **ORDERED:**

1.    Plaintiff's Motion is Granted.

2.    Pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure and 29 U.S.C.

§1132(g)(2)(A) through (E), judgment is entered in favor of Plaintiff, International Painters and

179854-1

Allied Trades Industry Pension Fund ("Pension Fund" or "Plaintiff"), and against Defendant, in the amount of $6,226.28, which consists of the following:

       (a)     Unpaid contributions in the amount of $2,770.00, due for the month May 2002 and the period July 2002 through December 2002;

       (b)     Liquidated damages in the amount of $687.87;

       (c)     Interest through February 15, 2007 in the amount of $687.87. The contribution amount in Paragraph 2(a) shall continue to bear interest as provided in 29 U.S.C. §1132(g)(2)(B) and 26 U.S.C. §6621, as from time to time amended, until the date of actual payment.

       (e)     $2,080.54, representing the attorneys' fees and costs incurred in the collection and enforcement of this action through February 14, 2007, in accordance with 29 U.S.C. §1132(g)(2)(D).

    3.     Defendant, its owners, officers, agents, servants, attorneys and all other persons acting on its behalf or in conjunction with it shall be and hereby are restrained and enjoined from refusing to file complete, proper and timely remittance reports with the accompanying contributions and dues for all periods Defendant is obligated to do so under the collective bargaining agreement(s);

    4.     Within ten (10) days of the entry of this Order, Defendant shall fully and accurately complete and submit to the Plaintiff any and all outstanding remittance reports, including but not limited to reports and contributions for the month May 2002 and the period July 2002 through December 2002, together with a check for the full amount of the contributions and dues due, including interest and liquidated damages.

5.    Within twenty (20) days of a request by Plaintiff or its counsel, Defendant shall make available to the designated representative of the Plaintiff all payroll books and related records necessary for Plaintiff to ascertain the precise amount of any delinquent contributions due and owing to Plaintiff for all periods in which Defendant is obligated to make fringe benefit contributions to the Plaintiff and Defendant shall bear the costs of said audit.

6.    Plaintiff shall have the right to conduct future audits for all relevant periods, including the time periods covered by this judgment. Defendant shall be and hereby is restrained and enjoined from failing and refusing to submit to such audits by certified public accountants selected by Plaintiff and shall produce all payroll books and related records requested by Plaintiff, including, but not limited to, payroll, wages, general ledger and cash disbursement records, compensation insurance audits and by other pertinent records deemed necessary for the purpose of ascertaining and/or verifying payments and/or liabilities to Plaintiff. Defendant shall pay Plaintiff any additional amounts found owing, plus such other amounts as set forth in the Agreement, the Agreement and Declaration of Trust of the Pension Fund, the International Painters and Allied Trades Industry Pension Plan, ERISA or any other applicable law.

7.    If additional delinquencies are discovered pursuant to the submission of the remittance reports or to the audit referred to above, or as a result of additional information that becomes available to the Plaintiff, the Plaintiff may apply to the Court for an additional or supplemental judgment reflecting any additional delinquencies, interest, liquidated damages, attorneys' fees and costs, pursuant to ERISA, 29 U.S.C. §1132(g)(2) together with any audit costs incurred by the Plaintiff.

8.    If any such further action by the Plaintiff is required, it may apply to this Court or to the court in which enforcement is sought, for such further reasonable attorneys' fees and costs

179854-1                                    3

in addition to those set out in Paragraph 2(d) above. See, Trucking Employees of North Jersey Welfare Fund, Inc. v. Bellezza Co., 57 Fed. Appx. 972 (3d Cir. 2003); International Painters and Allied Trades Industry Pension Fund v. H.W. Ellis Painting Co., Inc., No. 03-1125, slip. op. at *3 (D.D.C. February 10, 2004) (citing Free v. Briody, 793 F.2d 807 (7th Cir. 1986); Sheet Metal Workers Health and Welfare Trust Fund v. Big D Service Co., 867 F.2d 852 (10th Cir. 1989)).

9.      If Defendant fails to comply with any of the terms of this Order, the Plaintiff may, in addition to pursuing the remedies provided for under Federal Rule of Civil Procedure 69, reopen this case upon motion to the Court and notice to the Defendant, and may at that time ask for further appropriate monetary and/or injunctive relief.

BY THE COURT

Date:_____    By: _____
                                        John D. Bates,              J.
                                        United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL PAINTERS AND ALLIED   )
TRADES INDUSTRY PENSION FUND   )
   )
              Plaintiff,   )    CIVIL ACTION NO.
   v.   )    06-02167 (JDB)
   )
ALLIED PROFESIONAL SERVICES, INC   )
   a/k/a Allied Services   )
   )
              Defendants.   )

## DECLARATION OF THOMAS MONTEMORE

THOMAS MONTEMORE states and declares the following:

1.     My name is Thomas C. Montemore and I am the Assistant to the Fund

Administrator of the International Painters and Allied Trades Union and Industry Pension Fund

("Pension Fund", "Fund" or "Plaintiff"). I have held that position since February 1, 2000. I

served as Delinquency Controller from 1988 through October 31, 2000 and I have served as the

Delinquency Coordinator from 1986 to 1988, and before that, acted as Agreement Clerk from

1982 to 1986, and File Clerk beginning in 1979.

2.     The Pension Fund is an "employee benefit pension plan" as defined in Section

3(2)(A)(i) of ERISA, as amended, 29 U.S.C. §1002(A)(i), established by the International Union

of Painters and Allied Trades, AFL-CIO-CFL ("Union"), and employers in private industry

whose employees are members of or otherwise represented by the Union and its district councils

and local unions, for the purpose of providing retirement income to the employees. The Pension



Fund is administered in the District of Columbia from its and my principal place of business at 1750 New York Avenue, N.W., Washington, D.C. 20006.

3.      I have personal knowledge of the contents of the collective bargaining agreements, the Agreement and Declaration of Trust ("Trust Agreement") and the International Painters and Allied Trades Industry Pension Plan ("Plan") referenced in this Motion.

4.      The Pension Fund, as part of its normal operating procedure, maintain files containing copies of the collective bargaining agreements signed by each employer and copies of the remittance reports submitted by each contributing employer. The Pension Fund also maintains, as part of its normal operating procedures, a record of all contributions which are paid to the Pension Fund by each contributing employer, including copies of checks submitted directly from employers as payment for contributions due.

5.      My review of the regular business records maintained by the Pension Fund reveals that the defendant, Allied Professional Services, Inc. a/k/a Allied Services ("Defendant"), was a contributing employer of the Pension Fund and is bound to a collective bargaining agreement ("Labor Contract") with the International Union of Painters and Allied Trades, AFL-CIO, CLC. True and correct copies of relevant provisions of the Labor Contract are attached as Exhibit 2. Under the terms of the Labor Contract, Company is bound to the Trust Agreement and Plan. See, Exhibit 2, Labor Contract, Art. XVII.

6.      The collective bargaining agreement requires Defendant to submit monthly contributions to the Pension Fund on behalf of all employees in the bargaining unit, and sets forth the rate of contribution and the method for calculating the total amount of contributions due the Pension Fund. Contributions must be made for each hour for which employees receive pay at

the contribution rate specified in the agreements. Failure to make the required contributions, or to submit either incorrect or late remittance reports and contributions, results in a delinquency to the Pension Fund.

7.    My review of the records reveals that Defendant has failed to submit the contractually-required contributions to the Pension Fund for work performed pursuant to the collective bargaining agreement. Based upon the remittance reports prepared by Defendant and submitted to Plaintiff for the month of May 2002 and the period of July 2002 through December 2002, Defendant owes contributions in at least the amount of $2,770.00.

8.    Defendant owes interest through February 15, 2007 in the amount of $687.87 on the unpaid pension contributions set forth in ¶7. The interest has been calculated in accordance with the fluctuating IRS interest rate, as provided at section 10 of the Plan.

9.    Section 10 of the Plan parallels the ERISA statute, 29 U.S.C. § 1132(g)(2), and requires the assessment of liquidated damages against Defendant in an amount equal to the greater of the following: the amount of interest owed on the delinquent principal, or twenty percent (20%) of the delinquent principal. As noted above, the total interest owed through February 15, 2007 is $687.87. Twenty percent (20%) of Defendant's unpaid contributions is $554.00. Since the interest amount ($687.87) is greater than twenty percent (20%) of the unpaid contributions ($554.00), Defendant owes $687.87 in liquidated damages.

10.    The Pension Fund routinely audits employers to ensure all required contributions are being paid. It also audits employers in connection with delinquency collection lawsuits. An audit is the most accurate tool employed by the Pension Fund to ensure an employer's compliance with its statutory obligations. In performing these audits, the auditor reviews the

179798-1                                  3

payroll records of each employee who performs work of the type covered by the collective bargaining agreement. These records will include time cards, payroll ledgers, payroll summaries, time slips, or such other payroll records as the employer maintains which will indicate the number of hours that each individual employee worked and was paid for each week. The information gathered from these records is then compared to the wage information found on the employer's federal, state and municipal tax returns and on the W-2 statements provided to the employees. The auditor also reviews disbursement ledgers and check registers to identify potential wage payments to employees not made through the payroll system. Job/project contracts are reviewed to determine whether the work performed is within the scope of the collective bargaining agreement. After compiling the information gathered from the above records, a schedule of the contributions that should have been paid according to the contract is prepared. This schedule, which is broken down by month, is then compared to the actual contributions which the employer did submit to the Pension Fund, with any differences noted. Once completed, an audit report is forwarded to the employer for its review and payment.

11.    Despite a continuing contractual obligation to do so, Defendant has repeatedly failed to submit timely remittance reports and pension contributions. The Pension Fund and its Trustees are required to pay benefits to all properly eligible employees of contributing employers. Employees of contributing employers continue to accrue pension credits, based on the hours of their employment, regardless of whether their employers make pension contributions on their behalf for these hours, as contractually required. The Pension Fund's obligation to recognize pension credits and to pay pensions to vested employees is absolute and continues even if the employers fail to pay their required pension contributions. Employer

179798-1                                      4

contributions <u>and</u> the earnings the Pension Fund receives by investing these contributions comprise the assets from which the Pension Fund pays retirement benefits to participants and their dependents and beneficiaries. When employers, like Defendant, fail to pay their contributions or do not pay them timely, the Pension Fund is deprived of the investment income they otherwise could have earned. In addition, the Pension Fund also must engage in time-consuming and costly efforts to collect the unpaid contributions. These efforts include letters and phone calls to the employer, investigating other sources for collection and attempting to calculate delinquency amounts and benefit eligibility through other sources (e.g. paystubs), if available. Further, the Pension Fund has to process benefit eligibility and benefit claims manually so that participants (and their dependents) employed by the delinquent employer are not deprived of retirement benefits. The actual losses and added costs (in terms of dollar amount, capital and manpower) incurred by the Pension Fund in connection with an employer contribution delinquency are not capable of precise determination, but they are substantial. Defendant's refusal to contribute as it is bound means irreparable harm and injury to the Pension Fund – an obligation to make benefit payments to employees without necessary contributions from Defendant to cover those benefits. Therefore, Defendant should be required to submit timely current contributions and remittance reports in the future.

12.    I have executed this Declaration in support of Plaintiff's Motion for Default

Judgment against Defendant and request that this Court consider the same as proof in support of

the allegations contained in the Plaintiff's Complaint and other facts stated in this Declaration.

Pursuant to 28 U.S.C. §1746, I declare under
Penalty of perjury that the foregoing is true
and correct.

Executed on:  2/15/07

THOMAS MONTEMORE

**2001-2004**

**WORKING AGREEMENT**
**BETWEEN**

**LOCAL UNION NO. 246 FULLY AFFILIATED WITH IOWA, NEBRASKA, WESTERN**
**ILLINOIS DISTRICT COUNCIL 81**
**OF THE INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES**
**AFL-CIO-CLC**

**THE DES MOINES DRYWALL CONTRACTORS**
**AND OTHERS WHO DESIRE TO SIGN THIS AGREEMENT**

This AGREEMENT, made and entered into this 1st day of May 2001 by and between members of the DES MOINES DRYWALL CONTRACTORS, hereafter referred to as "CONTRACTORS", and the INTERNATIONAL BROTHERHOOD OF PAINTERS AND ALLIED TRADES LOCAL UNION NO. 246 FULLY AFFILIATED WITH IOWA, NEBRASKA, WESTERN ILLINOIS DISTRICT COUNCIL 81 OF THE INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES AFL-CIO, CLC, hereafter referred to as the "UNION".

## RECOGNITION CLAUSE

This Contract of Agreement shall be in full force and effect from the date of signing by both parties until and including April 30, 2004 WITNESSETH.

WHEREAS, the Contractors are engaged in drywall construction work in Des Moines, Iowa and

WHEREAS, IN THE PERFORMANCE OF THEIR PRESENT AND FUTURE operations the Contractors contemplate using members of the Union to perform the work of dry wall taping and finishing, and

WHEREAS, it is the desire of both parties to establish minimum rates of pay, hours of employment and working conditions for the members of the Union employed by the Contractors, and

WHEREAS, it is the desire of the parties hereto to provide, establish and put into practice effective methods for the settlement of misunderstanding, disputes of grievance between the parties hereto, to the end that the Contractors are assured continuity of employment and industrial peace is maintained.

NOW, THEREFORE, in consideration of the provisions and of the respective covenants and agreement of the parties hereto, each of which shall be interdependent, IT IS HEREBY AGREED:

1

EXHIBIT

## ARTICLE I
## EMPLOYER RECOGNITION

<u>Section 1. Management Rights.</u> It is understood and agreed that the Contractors reserve the sole right of management. The employer recognizes the Union as exclusive bargaining representative of employees covered by the agreement.

<u>Section 2. Subcontracting Clause.</u> The contractors may subcontract any portion of their work covered by this Agreement. When a competitive situation from non-union exist. Only union members will be on such jobs.

## ARTICLE II
## JURISDICTION

The provisions of this Agreement are in full force and effect for all work of drywall taping and finishing performed for and on behalf of the Contractors within the jurisdiction of Local Union No. 246 which includes the following counties: Pocahontas, Humboldt, Wright, Calhoun, Webster, Hamilton, Green, Boone, Marshall, Guthrie, Dallas, Polk, Jasper, Poweshiek, Adair, Madison, Warren, Marion, Mahaska, Union, Clark, Lucas, Ringgold, Decatur, Wayne, Wapello, Davis, Monroe, Appanoose, and Story in the state of Iowa.

## ARTICLE III
## HIRING OF WORKERS

Contractor agrees to notify union when hiring a new worker.

## ARTICLE IV
## DEFINITIONS

<u>Section1.</u> Employee or journeyperson taper, as used herein, means all qualified journeymen as further set forth in Section 2.

<u>Section 2.</u> Taper, as used herein, means and includes persons who work at the occupation of taping, also texturing when the material used in the same as used in the process of tape application.

<u>Section 3.</u> Contractors, as used herein, means any persons, firms or corporations who have signed this Agreement, have one or more journeyperson tapers, who

does taping for the public, furnish their own material, assume the responsibility for the satisfactory execution of a contract, and can meet qualifications that may be set up by a Trade Board.

Section 4. Apprentice, as used herein, means a person who has been indentured to a Contractor or the Trade Board and has been accepted as such by the Union.

## ARTICLE V
## WORKING RULES

Section 1. The Contractors and the Union agree that no journeyperson or apprentice shall work for a Contractor who has not signed this Agreement.

Section 2. The Contractors agree not to use more than one (1) apprentice to one (1) journeyperson he employs; exception to this clause shall be made by mutual agreement between members of the Trade Board.

## ARTICLE VI
## OUT-OF-TOWN WORK & OUT-OF-TOWN CONTRACTORS

Section 1. Firms from out of the city doing work in this area and locality are required to employ fifty per cent (50%) of their tapers from the available labor force covered by this Agreement and said tapers are to be hired through the Business Representative of this District Council 81.

The steward shall receive pay for the same number of hours as worked by the tapers in charge of the job. The wages and hours will be governed by the rules of this Agreement.

Section 2. The contractor or the employer party to this agreement, when engaged in work outside the geographical jurisdiction of the Union party to this agreement, shall employ not less than fifty percent (50%) of the workers employed on such work from the residents of the area where the work is performed or from among persons who are employed the greater percentage of their time in such area; any others shall be employed only from the contractor's home area.

Section 3. Shops located in the jurisdiction of the Union, as designated in Article II shall not use members of the Union outside of said area unless the terms and conditions herein are met. In the event such work is performed, by members of this Local Union, and there is then and there in force a working agreement in such area between local contractors and another Local Painters Union, the contractor will pay the greater of rates and benefits under either this Agreement or the other Agreement.    Section 4. Contractors failing to have out-of-

town help clear into the Union Hall before reporting to work will be in violation of this Agreement.

## ARTICLE VII
## HOURS AND WAGES

Section 1. Normal hours of work shall consist of eight (8) hours of work per day in an eight and one-half (8 1/2) hour period. One half (1/2) hour of the eight and one-half hour period shall be meal break and shall be held as closely as possible to the mid-point of the eight and one-half hour period. No employees shall be deprived of their meal period, nor be moved from one job to another during this time. All work after the eighth (8th) hour per day shall be at time and one-half. All hours worked in excess of ten (10) shall receive double the regular rate. All Saturday work shall be at time and one-half. Work performed on Sundays or Holidays shall be at double time. All work performed on Saturday and Sunday must be reported to the Union office. No work shall be done on Labor Day.

Section 2. (A) Forepersons are to receive not less than ($0.50) per hour in addition to the set scale. (B) Where there are six or more drywall finishers working on the same jobsite, the company shall appoint a foreperson.

Basic pay of all journeypersons drywall tapers from May 1, 2001 to April 30, 2002 shall be $20.61 per hour.

Basic pay for all journeypersons drywall tapers from May 1, 2002 to April 30, 2003 shall be $21.16 per hour.

Basic pay for all journeypersons drywall tapers from May 1, 2003 to April 2004 shall be $21.71 per hour.

Each year twenty-five ($0.25) cents will go into the Union and industry Pension Fund for the duration of this contract.

Section 5. A break will be allowed each A.M. to employees. This break shall be taken at their immediate working area. Gathering from various points will not be permitted.

Section 6. Subsistence. Transportation, board and room expense shall be negotiated with the employer.

Section 7. Payday shall be not later than 5:00 P.M. on the job each Friday. The contractor must use a regular payroll check with attached withholding slips, showing all deductions being withheld, with the number of check and withholding slip to the same number and date. The Union or Trade Board is

4

empowered to demand and examine the pay of any employee at the time such pay is received.

Section 8. Employees shall be paid at the time of discharge or layoff. Notification of discharge or lay-off shall be given on the job site at completion of the days work. When an employee covered by this Agreement is hired through the union hall or company and is told to report on any job at a specified time by the employer or forperson, and the employee is not put to work for reasons other than inclement weather conditions, the employee shall be paid two (2) hours pay. (Show-up time)

Section 9. No employee shall work for an employer who is in violation of the Agreement nor shall an employee work in violation of this Agreement.

## ARTICLE VIII
## PERMITS AND REPRESENTATIVE'S AUTHORITY

Section 1. The duly authorized business representative of the Union shall have access to all jobs during working hours.

Section 2. During the term of this Agreement the Union agrees there will be no strikes, picketing or work stoppages of any type. The employer agrees that there will be no lockouts during the term of the agreement. Nothing in this clause excludes the Union from strikes or picketing in the event that an employer fails to abide by a decision arrived upon through the grievance procedure.

Section 3. Journeypersons leaving town to work for an employer, must notify the Business Representative or the Financial Secretary of the Union of his leaving and upon returning. Contractors shall not be responsible for this.

## ARTICLE IX
## CONTRACTING

Section 1. No person, firm or corporation engaged as Dry Wall Contractors will be considered "Fair Contractors" unless that person, firm, or corporation has signed this Agreement. Any contractor signatory to this Agreement shall be allowed to work on the job, providing that contractor employs one or more journeypersons. The Contractor in this event does not have to join the Union. This shall in no way prohibit such contractor from being a member of the Union if he so desires.

Section 2. Any Union member who contracts work must sign this Agreement with the Union. If that member discontinues contracting and takes a job as a journeyperson, that member shall not be allowed to contract again for a period

of twelve (12) months.

Section 3. All contractors must carry Worker's Compensation Insurance, pay Social Security and Unemployment Insurance, including Occupational Disease, as required by law. The Contractor must furnish a certificate of insurance to the Local Union and identification number of Unemployment Insurance each year.

### ARTICLE X
### TOOLS AND EQUIPMENT

Section 1. Contractors and journeypersons are to care for and inspect all ladders, scaffolding and plants and other equipment used by them for the protection of their own safety and in the interest of the employer who provides and maintains the equipment. No journeyperson shall be discharged or penalized for refusing to work on equipment, which is not safe.

Section 2. Contractors shall furnish the following tools: Spray masks, pole sanders, safety helmets, stilts and all tools and equipment furnished by the Contractor shall be returned by the employee to the Contractor at termination of employment or on demand of the Contractor.

Section 3. Employees shall furnish their own following tools: Knives, pans, hawks, trowels, scoring knives, hatchets and tape measure.

### ARTICLE XI
### EMPLOYEE'S RIGHTS

Employees covered by this Agreement shall have the right to respect any legal picket line validly established by any bona fide labor organization, and the honoring of said picket line shall not be a violation of this Agreement nor grounds for discharge.

### ARTICLE XII
### FURNISHING OF WORKERS

Section 1. An obligation accepted by the Union is the furnishing at all times during the life of this Contract, sufficient skilled workers, as far as possible, who are capable of performing the work of the trade and to constantly endeavor to improve the ability of such workers and to have in the making a thorough apprenticeship training, where workers who appropriate apprenticeship program is established through the Apprenticeship Bureau of the U.S. Labor Department.

Section 2. The Union agrees not to enter into any agreement with any individual

6

employer or group of employers who are competing in whole or in part, in the same type of work covered by this Agreement, excepting under the exact terms of this Agreement. Nor will the Union waive any of the terms of this Agreement to any contractor.

## ARTICLE XIII
## JOINT TRADE BOARD

<u>Section 1. Bonding.</u> Each contractor signatory to this agreement, and all other employers to whom this agreement becomes applicable, shall furnish a bond from a bonding company licensed to do business in the State of Iowa in the amount of twenty thousand dollars ($20,000.00) to guarantee the payments required in this agreement of health and welfare, pensions and wages due to the employees, and any and all funds or trusts, created by this agreement, involving the payments described herein. All employers employing members of I.U.P.A.T. L.U. #246 at the time of the execution of this Agreement shall furnish satisfactory evidence of the bond referred to the Local Union and to the trustees of the funds applicable on or before May 1, 2001. All other employers to whom this agreement and the provisions thereof shall be applicable shall furnish said bond within fifteen (15) days from the time of employment of any employee under the terms and conditions of this contract.

The bond shall be for the period of this agreement. Each employee, trust fund, or other person or entity having a claim against any contractor under the provisions of this agreement shall notify the Painters and Allied Trades Joint Trade Board, in writing of the facts and circumstances of such unpaid obligation. The Joint Board or its representatives shall, after verification of the indebtedness, process a certification of default to the surety company for payment under the terms of the surety bonds and remit the funds received from the surety company to the person, fund or entity entitled thereto.

<u>Section 2. Insurance.</u> All contractors must carry Workers Compensation and Employers' Liability, Commercial General Liability of no less than $300,000. each occurrence, Automobile Liability; those signatory to this agreement shall pay social security and unemployment insurance regardless of the number of persons employed.

Those signatory to this agreement must furnish Certificate of Insurance each year and identification number of unemployment insurance.

<u>Section 3.</u> The Union and the Des Moines Painters Association do hereby establish and agree to maintain a tribunal called the Local Joint Trade Board for convenience hereafter called the Board, composed of ten (10) members, five (5) appointed by the Association and five (5) appointed by the Union. Each of

the parties hereto (i.e. the Union and the Association) may appoint one or more alternates, who, when designated by the appointing party, shall sit in the place of a regular member (who has been appointed by the same party) during such regular members absence or inability to function. The alternate when substituting, shall be vested with the same power and authority as the regular members. All vacancies shall be filled by the Association or Union making the appointment of the member whose position is vacant. Each member shall be subject to removal only by his/her appointing party.

When a non-member signatory to this agreement is charged with violating any of the provisions or conditions of this agreement or any other agreement, indenture or condition related to the Collective Bargaining Agreement between the parties hereto,

He/she shall be given the right to designate another non-member signatory to this Agreement, in good standing, to sit in the place and instead of one Association designate member of the Board, for the purpose of hearing and determining the particular charge or charges; in such an event the Association shall temporarily remove one of its appointed member of the Board to give affect to the aforementioned objective. The non-member signatory designated shall be vested with the same powers and authority as held by the other members of the Board.

Six members - three (3) Union appointees and three (3) Association appointees shall constitute a quorum. For quorum purposes, when a non-member signators designee is acting as a Board member, he/she shall be deemed an Association appointee. Decisions of the Board shall be determined by a majority vote, providing that the Association and Union appointees respectively have equal voting strength with respect to such vote. The members of the Board shall annually elect a Chairperson and a Secretary, provided that one of such officers is a Union appointee and the other is an Association appointee.

Section 4. The Board is empowered and vested with the authority to investigate, hear and determine all questions, disputes and grievances, arising from this agreement or any extensions or renewals thereof concerning any of the terms and conditions of any related or incidental agreement or indenture between the parties hereto as well as between the Union and any other signator and party to this agreement.

The Board is further empowered to award, assess and impose penalties, damages and remedies for violations of this agreement or any extension or renewal hereof or of any of the provisions of any related or incidental agreements or indentures; to issue any interpretative rulings pertaining to any of the provisions of the aforementioned documents; and to make and adopt and

8

prescribe such rules and rulings as it may deem necessary to give appropriate full force and effect to the intent and purposes of this and the aforesaid agreements; to examine or cause the examination of employer and union records which are material to the issues in dispute; to adopt and enforce all rules of conduct and procedure with respect to all matters and parties and witnesses; to appoint, employ and engage such personnel as may be necessary to carry out its duties and functions; to require all parties to a given dispute to testify under oath before a Notary Public present at the hearing or by separate affidavit; without limiting the powers of the Board, to require a violating employer to post a cash or surety bond to insure his/her future compliance with the contractual provisions he/she violated.

Section 5. The Trade Board shall have the power to demand and receive the payroll records of any and all contractors who are members of the Association, have signed this, or have been granted a Certificate of Compliance.

The Trade Board shall have the power to demand and examine the pay check and withholding slip of any journeyperson or apprentice member of the Union at the time such pay is received, or at any time thereafter.

Section 6. All complaints, charges, grievances and disputes shall be filed within 48 hours or occurrence with the Secretary of the Board in writing, setting forth all pertinent details, and a true copy of same shall be furnished to the party against whom the charge is made; a reasonable period shall be allowed for answer to the charges, and such answer must be in writing and filed with the Secretary of the Board within five (5) days after receiving the charges, and a true copy of such answer shall be furnished to the complainant with the same five (5) days. Reasonable notice of hearing in writing shall be given to all parties concerned. There shall not be work stoppage during the pendency before the Local Joint Trade Board.

No Union representative shall sit as a Board member in any case involving him/her or his/her employer, directly or indirectly; and no employer representative shall sit as a Board member in any case involving him/her or any of his/her employees, directly or indirectly.

Section 7. The findings, interpretations, decisions, awards, orders and determinations of the Board shall be final and binding upon all parties concerned, subject only to the rights of the parties to appeal (as herein provided) and subject to the applicable laws of the State pertaining to Arbitration.

All findings, interpretations, decisions, awards and determinations shall be rendered in writing and signed by the members of the Board or by the

Chairperson and Secretary of the Board. A true copy of same shall be sent to each affected party by registered or certified mail.

Section 8. The Board shall keep and maintain full and complete records and minutes of its proceedings, subject to inspection of same by any of the interested parties at reasonable times.

Section 9. If the grievance cannot be settled by the Joint Trade Board within twenty-four (24) hours the matter will be referred to an Arbitrator selected through the Federal Mediation and Conciliation Service for a final ruling with costs assessed and paid equally by the parties arbitration. All decisions shall be final and binding.

The Joint National Board is hereby authorized and empowered to delegate any question or issued submitted, to a committee of two (2) or more, one-half (1/2) of whom shall be appointed by each of the respective presidents of the Brotherhood and the Association, for the purpose of investigating, making recommendations to the National Board, or, in fact, resolving or determining the particular issue or issues, which determination shall be binding with the same force and effect as though rendered by the Board itself.

Section 10. Finances of the Board shall be derived from fees, assessments, fines or levies, except for assessment of actual damages imposed by the Board, as well as contributions to be made by each employer who is a party to or is bound otherwise by the terms and conditions of this agreement, such contribution to be:

a. Each application for registration certificate or shop card shall be on a form prescribed by the Trade Board and shall be accompanied by an initial fee of one hundred dollars ($100.00).

b. Issuance of registration certificate or shop card. Upon receipt of application for registration certificate or shop card, full payment of fee, and upon satisfactorily showing that the contractor has complied with all of the insurance and bonding requirements contained herein, and that the applicant is a bona-fide employer as described herein and the he/she employs at least one journeyperson painter, the Trade Board may issue a registration certificate or shop card upon his/her signing a counterpart of this Agreement.

c. Renewal. The registration certificate or shop card shall be renewed annually on or before May 1, of each year, providing the employer as herein defined has shown proof of the insurance and bonding requirements as set forth, and shall be issued upon payment of ten dollars ($10.00) renewal fee.

In the event there is a deficit in the financial operation of the Board, such deficit shall be borne equally by the Union and the Association, providing that such deficit expenditures have been approved by the Union and the Association.

Section 11. Certificate of Compliance. A non-resident contractor seeking to do business in the jurisdiction of I.U.P.A.T. L.U. #246 shall make application for authority to work in said jurisdiction, which application shall be accompanied by a signed Certificate of Compliance with the terms of this agreement and evidence of good standing with IUPAT District Council 81, AFL-CIO having jurisdiction, at his/her principal place of business.

Section 12. Payroll Records.

a. Forms. Payroll forms shall show quarterly earnings with all hours shown as regular or overtime, rates, regular and overtime and all earnings and deductions shown and identified as such.

b. Checks. The Contractor must use a regular check with attached withholding and deduction slips bearing the number and date corresponding with the number and date of the check, showing all deductions withheld.

## ARTICLE XIV
## APPRENTICESHIP AND TRAINING

The Employers and the Union hereby establish/maintain an Apprenticeship and Training Fund to be known as the International Union of Painters and Allied Trades District Council 81, Apprenticeship and Training Funds hereinafter referred to as the Apprenticeship and Training Fund, under a Trust Agreement attached hereto as Exhibit A and made a part hereof.

1.     (a)     Commencing with the first day of May, 2001 and for the duration of this Agreement, and any renewals or extensions thereof, the Employer, as defined in the Agreement and Declaration of Trust executed by and between the International Union of Painters and Allied Trades District Council 81, agrees to make payments to the International Union of Painters and Allied Trades District Council 81 Apprenticeship and Training Fund for each employee covered by this Agreement, as follows:

(1)     For each hour an employee receives pay, the Employer shall make a contribution of (10) ten cents to the above named Apprenticeship and Training and Trust Fund for the first year, an additional five (5) cents for a total of fifteen (15) cents for the second year, and an additional five (5) cents for a total of twenty (20) cents for the third year.

(2)    Contributions shall be paid on behalf of any employee starting with the employee's first hour of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices, journeymen, trainees and probationary employees.

(3)    The payments to the Apprenticeship and Training Fund required above shall be made to the International Union of Painters and Allied Trades District Council 81 Apprenticeship and Training Fund, which was established under an Agreement and Declaration of Trust, dated May 1, 2001. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as though he had actually signed the same.

(4)    From the funds collected in the above manner, the Trustees of the International Union of Painters and Allied Trades District Council 81 Trust shall hold in trust the sum of five cents (.05) per hour for each hour or portion of an hour for which an employee receives pay, and remit said sum to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) at such regular periods of time and in the manner and form as shall be determined by the Trustees of the International Fund.

(5)    The payments to the International Fund required in paragraph (1) (a) (4) above shall be made to the IUPAT-JATF, which was established under an Agreement an Declaration of Trust dated May 1, 1995. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as though it has actually signed the same.
(b)    The Employer hereby irrevocably designates as its representatives on the Board of Trustees of the IUPAT-JATF such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

(c)    The Union hereby irrevocably designates as its representatives on the board of Trustees of the IUPAT-JATF such Trustees as are now serving, or who will in the future serve, as Union Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

(d)    The parties hereto further agree to be bound by all actions taken by the Trustees of the IUPAT-JATF pursuant to the said Agreement and Declaration of Trust.

2.    All contributions shall be made at such time and in such manner as the Trustees require, and the Trustees shall have the authority to have a Certified Public Accountant audit the payroll and wage records of the Employer for the

12

purpose of determing the accuracy of contribution to the Apprenticeship Fund

3.    If an Employer fails to make contributions to the District Council 81 Trust within twenty (20) days after the date required by the Trustees, such failure shall be deemed a violation of this agreement, and the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provisions hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collecting the payments due together with the attorney's fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause, which may be provided or set forth elsewhere in this Agreement.

4.    The Apprenticeship Plan adopted by the Trustees of said Apprenticeship Funds shall at all times conform with the requirements of the Internal Revenue Code and other applicable laws and regulations so as to enable the Employer at all times to treat contributions to the Apprenticeship Fund as a deduction for income tax purposes.

The Employer hereby irrevocably designates as its representatives on the Board of Trustees of the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund, such Trustees as are now serving, or who will in the future serve, as Employer Trustees. Together with their successors, as provided for in the aforesaid Trust Indenture.

5. Apprentice.
   a.    Definition of Apprentice. The term "Apprentice" as herein applied shall be defined as any person who may be employed by an employer subject to the rules and conditions as set out in these working rule, the Apprenticeship Standards and the constitution of the International Union of Painters and Allied Trades District Council 81, AFL-CIO CLC.

   b.    Number of Apprentices Permitted. Each Employer shall employ and train apprentices in the following ratio to journey workers employed in the shops:
   One (1) apprentice per _____ journey workers
   Two (2) apprentices per _____ journey workers
   c.    Compliance with the General Constitution. All apprentices must comply with Sections 94 through 98 of the General Constitution of the International Union of Painters and Allied Trades, AFL-CIO.
   d.    Hiring of Apprentices. Contractors who hire apprentices must obtain them through the Joint Apprentice Council. Contractors who hire apprentices must join and continue in good standing as

13

members of the District Council for the duration of this Agreement.

e.    An Apprentice shall not work alone for more than four (4) hours until his third (3rd) year.

f.    No Apprentice shall act in capacity as foreman during the first two (2) years of Apprenticeship.

g.    It is agreed apprentices shall receive 144 hours per year of schooling given by the Joint Apprenticeship Council and approximately 1600 hours per year on-the-job-training.

## COMPENSATION OF APPRENTICES

### Rate of Pay

1st 800 hours 40%
2nd 800 hours 50%
3rd 800 hours 60%
4th 800 hours 70%
5th 800 hours 80%
6th 800 hours 90%

After completion of 4800 hours, the Apprentice shall receive not less than journeyperson scale.

## ARTICLE XV
## CHECK-OFF OF ADMINISTRATIVE DUES

Section 1.  During the term of this Agreement and in accordance with the terms of an individual and voluntary written authorization for check-off of services dues and/or working assessments in form permitted by the provisions of Section 302 (C) of the Labor-Management Relations Act, as amended, the Employer shall deduct from the wages of each employee covered by this Agreement, four percent (4%) of the member's gross wages as working assessments and/or service dues in the amount stipulated on written lawful authorization form.

Section 2.  Said sums shall be remitted to Local No. 246 on the forms provided for same.  Sums deducted by the employer for the current month shall be forwarded to such business office, not later than the fifteenth (15th) day of the following month.

## ARTICLE XVI
## LABOR MANAGEMENT COOPERATION FUND

Section 1.  Commencing with the 1st day of May, 1998, and for the duration of the agreement, and any renewals or extension thereof, the Employer agrees to

14

make payments to The Painters and Allied Trades Labor Management Cooperation Fund ("Fund") for each employee covered by this agreement, as follows:

Section 2. For each hour or portion thereof, for which an employee received pay, the Employer shall make a contribution of five cents ($.05) to the Fund.

Section 3. For the purpose of this Article, each hour paid for, including hours attributable to show up time, and other hours for which any is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

Section 4. Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices, helpers, trainees, and probationary employees.

Section 5. The Employer and Union signatory to this Agreement agree to be bound by and to the Agreement and Declaration of trust, as amended from time to time, establishing the Fund.

## ARTICLE XVII
## I.U.P.A.T. UNION AND INDUSTRY PENSION FUND

Section 1. Commencing with the 1st day of August, 1998, and for the duration of the Agreement, and any renewals or extension thereof, the Employer agrees to make payments to the I.U.P.A.T. Union and Industry Pension Fund for each employee covered by this Agreement, as follows:

b. For each hour or portion thereof for which an employee receives pay, the Employer shall make a contribution of two dollars and twenty-five cents, ($2.25) to the above named Pension Fund.

c. For the purpose of this Article, each hour paid for, including hours attributable to show up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

d. Contributions shall be paid on behalf of any Journeyperson or Apprentice member of Local #246 covered by this Agreement, starting with the first day of employment.

e. The payments to the Pension Fund required above shall be made to the I.U.P.A.T. Union and Industry Pension Fund, which was established under an

15

Agreement and Declaration of Trust, dated April 1, 1967. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as amended from time to time, as though he had actually signed the same.

Section 2. The Employer hereby irrevocably designated as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors. The Employer further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust, as amended from time to time.

Section 3. All contributions shall be made at such time and in such manner, as the Trustees require; and the Trustees may at any time conduct an audit in accordance with Article VI, Section 6 of the said Agreement and Declaration of Trust.

Section 4. If an Employer fails to make contributions to the Pension Fund within twenty days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision thereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due together with attorney fees and such penalties as may be assessed by the Trustees.

The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike " clause, which" may be provided or set forth elsewhere in this Agreement.

Section 5. The Pension Plan and Annuity Plan adopted by the Trustees shall at all time conform with the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat contribution to the I.B.P.A.T. Union and Industry Pension Funds as a deduction for income tax purposes.

## ARTICLE XVIII
## BENEFIT FUND CONTRIBUTIONS

Section 1. All Employers signatory to this working agreement or a Participation Agreement shall contribute Two Dollars and Fifty Cents ($2.50) to the **Painters District Council 81 Health and Welfare Fund (Fund)** for each hour worked by each employer employee eligible to participate in the Fund. Eligible participants are those employees who, on the day of execution of this Agreement, through no **choice** of their own, are **not** an eligible dependant under a Group Health Plan in which the employee's spouse or partner is the eligible Participant; or who subsequent to the day of execution of this agreement **ceases** to be such eligible dependant through **no choice** on the part of the employee dependant. It shall be

16

presumed that an employee is eligible as a Health and Welfare Fund participant unless the employee can demonstrate that the employee is not eligible as a Health and Welfare Fund participant through **no choice** on the part of the employee. Employers signatory to this agreement and Employers who are not signatory to this agreement but are working under the terms of this agreement and have signed a participation agreement with respect to the making of contributions to the Fund, shall as part of making said contributions be considered as having appointed the employer Trustees of the Health and Welfare Fund as their Trustees and as having adopted the terms of the Agreement and Declaration of Trust of said Fund and agree to abide by the same. Contributions and reports to the Fund shall be sent to the address directed by the Trustees and checks for said contributions shall be made payable as directed by the Trustees.

Section 2. All Employers signatory to this working agreement or a Participation Agreement shall contribute Two Dollars and Fifty Cents ($2.50) to the **Painters District Council 81 Retirement Savings Fund (Fund)** for each hour worked by each employer employee eligible to participate in the Fund. Eligible participants are those employees who are **not eligible to participate in the District Council 81 Health and Welfare Fund.** Employers signatory to this agreement and Employers who are not signatory to this agreement but are working under the terms of this agreement and have signed a participation agreement with respect to the making of contributions to the Fund shall as part of making said contributions be considered as having appointed the employer Trustees of the Retirement Savings Fund as their Trustees and as having adopted the terms of the Agreement and Declaration of Trust of said Fund and agree to abide by the same. Contributions and reports to the Fund shall be sent to the address directed by the Trustees and checks for said contributions shall be made payable as directed by the Trustees.

Section 3. Employers signatory to this Agreement and those employers working under a Participation Agreement agree that employees working pursuant to this Agreement or a Participation Agreement may elect to participate in the **Painters District Council 81 401(k) Fund Deferred Savings Plan** by signing a Tax Deferred Savings Authorization Form provided by the Fund Trustees directing the signatory employer to reduce the employee's hourly pay by Fifty Cents ($0.50) per hour or multiples of Fifty Cents ($0.50) per hour to a maximum as allowed under the Internal Revenue Code. Employees may change the amount of the Tax Deferred Savings at the beginning of the payroll week immediately after January 1 in any year this Contract is in effect, in units of Fifty Cents ($0.50) per hour, but in no case shall the amount be greater than allowed under the Internal Revenue Code. An employee may elect a tax-deferred savings at the time an employee initially commences employment with any employer. Employee election to have tax deferred savings transferred to the 401(k) Plan must be made in writing at least ten (10) days prior to the stated election day, which is annual, other than initial employment. All tax-deferred savings requests must be

17

filed by the employee with the employer with a copy as directed by the Fund Trustees.  An Employee may cease such deferrals at any time by giving written notice to the Employer.  However, the Employee may not again elect deferrals until the beginning of the ensuing calendar year.  Employers signatory to this working agreement and Employers who are not signatory to this agreement but are working under the terms of this agreement and have signed a participation agreement with respect to the making of contributions to the Fund, shall as part of making said contributions be considered as having appointed the employer Trustees of the Retirement Savings Fund as their Trustees and as having adopted the terms of the Agreement and Declaration of Trust of said Fund and agree to abide by the same.  Contributions and reports to the Fund shall be sent to the address directed by the Trustees and checks for said contributions shall be made payable as directed by the Trustees.

Section 4.  Contributions and deferrals to the above Funds shall be made on behalf of each employee to the Third-Party Administrator (TPA) mutually agreed upon by each of the Funds, which TPA shall verify employee eligibility upon independent investigation pursuant to the foregoing as well as rules and regulations established by the Trustees of the Funds. Said contributions shall be made in the form of one check for the total of all contributions to the Funds and shall be reported on one form in the manner mutually designated by the Trustees of the Funds. Such contributions shall be received by the TPA no later than the 15th of the month following the month the contributions accrued. Contributions not received by the 15th of the month shall be considered as delinquent and the delinquent Employer shall be assessed a penalty in the amount of 20% of the contributions, which were due. Said penalty shall be paid within 5 days of demand by the TPA, otherwise the TPA shall turn the same over to the attorney named by the Trustees for collection and the delinquent employer shall pay in addition, the costs of collection including court cost, attorney fees and accounting fees if the Trustees determine in their sole discretion to have a payroll audit performed on the delinquent employer. If an employer is delinquent in contributions more than three times during the term of this agreement the Trustees of each Fund shall determine, in their sole discretion, the amount and period of a cash bond to be posted by the employer with each of the Funds to guarantee future contribution payments.

## ARTICLE XIX
## UNDERSTANDING & DURATION

Section 1.  This Agreement covers the entire understanding between the parties hereto.  No oral or written rule, regulation or understanding which is not mentioned or referred to herein, will be of any force or effect upon any party hereto, unless first sanctioned by the Joint Board.

18

<u>Section 2.</u>  In case any Section of this Agreement is declared invalid by Law, it shall not affect validity of the remainder of this Agreement.

<u>Section 3.</u>  This Agreement shall be binding on both parties beginning May 1, 2001 and running to and including April 30, 2004.  Should either party desire any change at the expiration of this Agreement, it is agreed that sixty (60) days notice prior to the termination of this Agreement is to be given the Contractor or Union by Registered Mail.  Either party requesting such changes shall be held. Negotiations must commence within ten (10) days after such notification.  In case neither party notifies the other party as stated above, this Agreement shall be in full force from year to year.

## ARTICLE XX
## MARKET RECOVERY

In the event conditions impact on the industry, requiring a market recovery program, the parties signatory to this Agreement, shall meet upon request, to negotiate mutual terms.  This Agreement shall continue until such mutual terms are agreed to.

## ARTICLE XXI
## UNION OPTION

During any year of this Agreement the Union shall have the option to apply any portion of the hourly rate to benefits, including but not limited to pension, annuities and/or health and welfare.  However, it is mutually agreed that during the term of this agreement a minimum of 5 cents per hour increase per year of the benefits paid will be applied toward apprenticeship Training and Trust Fund to a maximum of $0.20.

## DRUG TESTING

The employer shall be free to establish a drug and alcohol-testing program for all employees covered by this Agreement.  The program shall conform to all state and federal regulations.

## ACKNOWLEDGMENT

IN WITNESS WHEREOF, the principals hereto have executed this agreement on the date above mentioned.

**INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES DISTRICT COUNCIL 81, AFL-CIO**

**EMPLOYERS:**

_____
Business Manager/Financial Secretary

_____ A0567
Allied Construction Services

_____ K1335
Kennedy and Company

_____ D0406
Olympic Wall Systems, Inc.

_____
1st Interiors, Inc.

_____
(New contractor signature line)

20

| INDEX | | DESCRIPTIONS | STARTING PAGE |
|---|---|---|---|
| ARTICLE | I | EMPLOYER RECOGNITION | 2 |
| ARTICLE | II | JURISDICTION | 2 |
| ARTICTLE | III | HIRING OF WORKERS | 2 |
| ARTICLE | IV | DEFINITIONS | 2 |
| ARTICLE | V | WORKING RULES | 3 |
| ARTICLE | VI | OUT-OF-TOWN WORK & OUT-OF-TOWN CONTRACTORS | 3 |
| ARTICLE | VII | HOURS AND WAGES | 4 |
| ARTICLE | VIII | PERMITS AND REPRESENTATIVE'S AUTHORITY | 5 |
| ARTICLE | IX | CONTRACTING | 5 |
| ARTICLE | X | TOOLS AND EQUIPMENT | 6 |
| ARTICLE | XI | EMPLOYEE'S RIGHTS | 6 |
| ARTICLE | XII | FURNISHING OF WORKERS | 6 |
| ARTICLE | XIII | JOINT TRADE BOARD | 6 |
| ARTICLE | XIV | APPRENTICESHIP AND TRAINING | 11 |
| ARTICLE | XV | CHECK-OFF OF ADMINISTRATIVE DUES | 14 |
| ARTICLE | XVI | LABOR MANAGEMENT COOPERATION FUND | 14 |
| ARTICLE | XVII | I.U.P.A.T. UNION AND INDUSTRY PENSION FUND | 14 |
| ARTICLE | XVIII | BENEFIT FUND CONTRIBUTIONS | 16 |
| ARTICLE | XIX | UNDERSTANDING & DURATION | 18 |
| ARTICLE | XX | MARKET RECOVERY | 18 |
| ARTICLE | XXI | UNION OPTION | 18 |



# INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES
## IOWA, NEBRASKA & WESTERN ILLINOIS
### DISTRICT COUNCIL 81
1450 NE 69TH PLACE, SUITE 50
ANKENY, IOWA 50021
(515) 289-0482 • FAX (515) 289-0558 • 1-866-373-2755

May 1, 2002

Gary J. Meyers, Fund Administrator
I.U.P.A.T.
1750 New York Avenue, NW
Washington, DC 20006

**RECEIVED MAY 1 4 2002 IUPAT PENSION FUND**

RE: Local Union 246 – Mid-Iowa Painting & Wallcovering, Inc.

Dear Fund Administrator Meyers:

Here is a copy of a painting collective bargaining agreement that was just signed between Local Union 246, which is affiliated with District Council 81, and a new painting contractor, Mid-Iowa Painting & Wallcovering, Inc. Mid-Iowa Painting & Wallcovering, Inc. is located at P.O. Box 248 in Berwick, Iowa 50032. The owner is Mr. Steve Furman. His cell phone number is (515) 202-6206. The office telephone number is (515) 262-8072, and his fax number is (515) 262-2139.

If you have any questions, please feel free to contact me at 1-866-373-2755 or (515) 289-0482.

Fraternally,

William H. Guyer
Business Manager/Secretary-Treasurer

Enclosure

kms/iupat#246

# INTERNATIONAL UNION OF
# PAINTERS AND ALLIED TRADES
# DISTRICT COUNCIL 81

## LABOR AGREEMENT WITH

## DES MOINES MASTER PAINTERS ASSOCIATION

### ARTICLE I.

This Agreement is made and entered into this 1st day of May, 2001, by and between Des Moines Masters Painters Association hereinafter referred to as the Employer, and the International Union of Painters and Allied Trades Local 246 fully affiliated with District Council 81 affiliated with the International Union of Painters and Allied Trades, AFL-CIO, CLC (IUPAT), hereinafter referred to as the Union.

### ARTICLE II.  WITNESSETH

WHEREAS, the parties hereto have historically been the respective collective bargaining representatives for labor and management in the painting and decorating industry in the area hereinafter described:  and

WHEREAS, the Union has been the sole spokesman and representative for the employees of employers covered by the agreement; and

WHEREAS, the Association has been the sole spokesman and representative for the employers of employees covered hereby, and the Association has, as such representative, covered hereby, and the Association has, as such representative, covered herein, maintaining and conducting apprenticeship and training programs, and has also supplied the employer-manpower representing employers on the Joint Trade Board (or Joint Committee) as well as on various Boards of Trustees administering the employee and Trust Plans provided for in prior and this Collective Bargaining Agreement; and

WHEREAS, it is intent and purpose of the agreement to establish and maintain harmonious labor relations and uniform conditions of employment in the painting and decorating industry, and also to avoid stoppage of work and losses ensuing there from to all parties concerned, as well as the public, and to provide a medium of expeditiously and peacefully adjusting and solving all grievances and disputes which may arise under this agreement; and

1





WHEREAS, the parties hereto; to wit:  The Union in behalf of all employees covered hereby, and the Association in behalf of all its present and future Union employer members and all other employers who become signatories to this agreement, dedicate themselves to keep themselves abreast of all technical developments and advancements of the painting, decorating, coating and other phases of the industry, and to impart such information to all parties concerned, including the consuming public.

NOW, THEREFORE, the parties hereto do mutually agree as follows, in consideration of the mutual promises and covenants herein contained:

Due to the expanded geographic jurisdiction of District Council 81 the parties agree that when the area Agreements of the Local Unions affiliated with District Council 81 expire, every effort will be made to incorporate those agreements into this Collective Bargaining Agreement understanding that economic conditions may not be the same in those areas.

Section 1.  Definitions.

a.  Association - Association is the Local Organization of Contractors as collective bargaining agent for all present and future Union employer members as well as for all other bonafide employers.

b.  Union - The Union is the Local Body of employees affiliated with the International Union of Painters and Allied Trades District Council 81.

c.  Employer - Any individual, partner, corporation, joint venture or business entity which is a member of the Association or as a non-member is a party or signatory to this agreement who is engaged principally in the painting, decorating and related trades as defined herein.

d.  Non-Member signatory or employer - An employer who is not a member of the Association but is a signatory to this Agreement.

e.  Employees - Includes all journeypersons covered by the agreement, as well as apprentices who are properly qualified in accordance with the prescribed requirements for an apprentice of the trade covered by the agreement and in accordance with the rules and regulations of the Joint Apprenticeship Program in the area of this Agreement.

f.  Agreement - Means this Collective Bargaining Agreement and shall be the controlling document over all other indentures and agreements, which are entered into pursuant to the provisions of this agreement.

g.  Joint Committee or Joint Trade Board - is the Arbitration Tribunal for the purpose of investigating, hearing and determining and adjudicating all issued

2

and disputes arising under the terms and conditions of this Agreement and any supplemental agreement or indentures.

## ARTICLE III.  RECOGNITION CLAUSES

Any Associations within the geographical jurisdiction of the International Union of Painters and Allied Trades District Council 81 hereby recognizes the Union as the collective bargaining representative of all the employees covered by this agreement. The non-member signatories who become parties to this agreement do hereby likewise recognize the Union as the collective bargaining representative of all employees of said employer and as are covered by this Agreement.

The Union hereby recognizes any Association representing the painting industry as the collective bargaining agent and representative of its present and future union employers and all non-members who are signatories to this agreement as well as those independent employers who assign their bargaining rights to the Associations, during the term of this agreement and any extensions thereof and for any purposes that may be necessary for the administration of this agreement. Insofar as the members of the Associations are concerned, there shall be no limitations as to the terms of authority hereunder so long as those members remain members of the Associations.

The Employer recognizes, acknowledges, and agrees that District Council 81 is, within the meaning of Section 9(a) of the National Labor Relations Act, the exclusive representative for the purpose of collective bargaining, of all the Employer's employees wherever such employees may be employed, in the following classifications of work:

The Employer agrees that all work generally recognized, as coming with the painting industry shall be assigned to painters.

This shall include but not be limited to the following:

Application of all painting and decorative coatings and finishes and all preparatory work thereto.

Sandblasting preparatory to application of paints or coatings and to expose aggregate finish and operation of all equipment used in performance of such work.

Erection, moving and dismantling of all scaffolding used by painters in performance of their work.

Operation of all equipment used by painters in performance of their work.

3

The term painting and decorative coatings and finishes as used herein includes but is not limited to:

Painting
Decorating
Paperhanging and all preparatory work thereto, including removal
Application and removal of any and all types of wall covering
Finishing of wood, metal or other surfaces
Operations in connection with exposed aggregate finishes
Application of seamless floor products including necessary preparatory work
Taping, surfacing and texturing of drywall surfaces
Application of insulating, acoustical and foam products
Application of wet film waterproofing coatings
Clean up of all operations by painters
Application of fire retarding materials

and similar or related classifications of work.

## ARTICLE IV.  CONDITIONS

Nothing herein contained shall restrict or prohibit the Union from their collective bargaining, which may be legally required of them with other parties; however, if any other employer shall receive more favorable conditions compared to those in the collective bargaining agreement, then this agreement shall be deemed automatically amended to include such modified and more favorable conditions.

This agreement contains and shall constitute all of the prevailing terms and conditions, which prevail in the geographical area covered by this agreement.

## ARTICLE V.  JURISDICTION

All the counties in Iowa, Nebraska, and the full counties of Illinois.  Painters and mixed trades in all counties in the state of Iowa; all counties in the state of Nebraska; in the complete counties of Union, Clay, and Yankton in South Dakota; and in the complete counties of Carroll, Henderson, Henry, Knox, Mercer, Rock Island, Warren, and Whiteside in Illinois.

The territorial jurisdiction is recognized as including all areas in the following Iowa counties:  Adair, Appanoose, Black Hawk, Boone, Bremer, Buchanan, Butler, Calhoun, Cerro Gordo, Chickasaw, Clarke, Dallas, Davis, Decatur, Emmet, Fayette, Floyd, Franklin, Greene, Grundy, Guthrie, Hamilton, Hancock, Hardin, Howard, Humboldt, Jasper, Kossuth, Lucas, Madison, Mahaska, Marion, Marshall, Mitchell, Monroe, Palo Alto, Pocahontas, Polk, Poweshiek, Ringgold, Story, Tama, Union, Wapello, Warren, Wayne, Webster, Winnebago, Winneshiek, Worth,

Wright and any counties which may be added in the future by the general officers of the International Union of Painters and Allied Trades.

In the event of any jurisdictional dispute with regard to craft jurisdiction, it is understood and agreed that trade agreements and decisions of the AFL-CIO as well as decisions of the National Joint Board shall govern settlement of said dispute. There will be no work stoppage until such time that it has been awarded.

## ARTICLE VI.  UNION SECURITY UPON REPEAL OF EXISTING LAW

In the event of the repeal or amendment of the Iowa Right-to-Work Laws and/or the Labor-Management Relations Act of 1947 or otherwise, or in the event of new legislation of judicial decision rendering permissible the utilization of a form of Union security specified in the following clauses, then, and in such event, the following Union security clauses or those which are legally permissible, shall automatically become effective, but not until such time.

Section 1.  Union Shop.   All employees shall be obligated to become members of the Union after the seventh (7th) day, but not later than the tenth (10th) day, of employment, the date of the execution of this agreement or the effective date of this clause, whichever occurs later, as a condition of continued employment.

Section 2.  Agency Shop.   All employees shall, as a condition of continued employment, pay to the Union, the employees' exclusion collective bargaining representative, an amount of money equal to that paid by other employees in the bargaining unit who are members of the Union, which shall be limited to an amount equal to the Union's regular and usual initiation fees, dues and uniform assessments.  For existing employees, such payments shall commence seven (7) days following the date of execution of the agreement; and for new employees, the payment shall start seven (7) days following date of employment.

Section 3.  Discharge.   Any employee who fails to become a member of the Union as required in the foregoing paragraph Union Shop or fails to meet his/her obligation as required in paragraph Agency Shop of this Article, shall forfeit his/her right of employment and employer shall immediately discharge such employee.

## ARTICLE VII - ANTI-DISCRIMINATION CLAUSE

It is expressly understood and agreed that the employer shall have entire freedom of selectivity in hiring journeypersons, providing there shall be no discrimination on the part of employer, against any employee or applicant for employment because of race, color, religion, national origin or sex.

The sponsor will take affirmative action to provide equal opportunity in the recruitment, selection, employment and training of apprentices during their apprenticeship and will operate the apprenticeship program as required under Title 29 of the Code of Federal Regulations, Part 30.

Likewise, the Union and its officials and members shall not, in any manner whatsoever, discriminate against or in favor of any employer of persons covered by this Agreement.

## ARTICLE VIII - CONTRACTS AND JOBS OUTSIDE OF LOCAL JURISDICTION

Section 1. 50% - 50% Clause  The contractor or the employer party to this Agreement, when engaged in work outside the geographical jurisdiction of the Union party to this Agreement, shall employ not less than fifty (50%) percent of the employees on such work from the residents of the area where the work is performed or from among persons who are employed the greater percentage of their time in such area; any others shall be employed from the contractor's home area.

Section 2.  The Employer party hereto shall, when engaged in work outside the geographic jurisdiction of the Union party to the agreement, comply with all of the lawful clauses of the Collective Bargaining Agreement in effect in said other geographic jurisdiction, including but not limited to, the wages, hours, working conditions, fringe benefits, and procedure for settlement of grievances set forth therein; provided however, that as to employees employed by such employer from within the geographic jurisdiction of the Union party to this agreement and who are brought into an outside, such employee shall be entitled to receive the wages and conditions effective in either the home or outside jurisdiction whichever are more favorable to such employees, and fringe benefit contribution on behalf of such employees shall be made solely to their home funds in accordance with their governing documents.  This provision is enforceable by the Local Union or District Council in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable Collective Bargaining Agreement and through the courts, and is also enforceable by the Union party to this agreement, both through the procedure for settlement of grievances set forth in this agreement and through the courts.

Section 3.  Out - of - Area Contractor.  Firms from out of this jurisdiction coming into this locality shall register with the Union office and meet all qualifications, as provided under the terms of the agreement, and employ at least fifty (50%) percent of their employees from the available labor force of this locality, and said workers are to be hired through the Business Representative of this Local and shall be given an introduction slip signed by the Business Representative.

## ARTICLE IX - PRESERVATION OF WORK

6

Section 1.  To protect and preserve, for the employees covered by this agreement, all work they have performed and all work covered by this agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed as follows:  If the Employer performs onsite construction work of the type covered by this agreement, under its own name or the name of another, as a corporation, company, partnership, or other business entity, including a joint venture, wherein the Employer, through its officers, directors, partners, owners, or stockholders, exercises directly or indirectly (through family members or otherwise), management, control, or majority ownership, the terms and conditions of this agreement shall be applicable to all such work.

Section 2.  All charges of violations of Section 1 of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this agreement on the handling of grievances and the final and binding resolution of disputes.

As a remedy for violations of this Article, the Joint Trade Board or Arbitrator shall be able, at the request of the Union, to require an Employer to pay 1) to affected employees covered by this agreement, including registered applicants for employment, the equivalent of wages those employees have lost because of the violations, and 2) into the affected Joint Trust Funds to which this agreement required contributions any delinquent contributions that resulted from the violations.  The Joint Trade Board or Arbitrator shall be able to also to provide any other appropriate remedies, whether provided by law or this agreement.  The Union shall enforce a decision of the Joint Trade Board or Arbitrator under this Article only through arbitral, judicial, or governmental channels.

Section 3.  If, after an Employer has violated this Article, the Union and/or the Trustees of one or more Joint Trust Funds to which this agreement requires contributions institute legal action to enforce an award by an Arbitrator or the Joint Trade Board remedying such violation, or defend an action that seeks to vacate such award, the Employer shall pay an accountants' and/or attorneys' fees incurred by the Union and/or the Joint Trade Funds, plus costs of the litigation, that have resulted from such legal action.  This section does not affect other remedies, whether provided by law or this Article, that may be available to the Union and/or the Joint Trust Funds."

## ARTICLE X - REFERRAL CLAUSE

The employers agree to notify the Union representative of all their requirements for skilled workers and upon request; the employees' representative will attempt to furnish the workers requested.

## ARTICLE XI - WORKING RULES

Section 1. Hours. The normal hours of work shall be 8:00 A.M. to 4:30 P.M. Normal hours of work shall consist of eight (8) hours of work per day in an eight and one-half (8-1/2) hour period. One half (1/2) hour of the eight and one-half hour period shall be meal break and shall be held as closely as possible to the mid-point of the eight and one-half hour period. No employee shall be deprived of their meal period, nor be moved from one job to another during this time. All work after the eighth (8th) hour per day shall be a time and one-half. All Saturday work shall be at time and one-half. Work performed on Sundays or Holidays shall be double-time. All work performed on Saturday and Sunday must be reported to the Union office.

Contractors and employees have the option of four (4) ten (10) hour days. No employee shall be penalized for refusing to work ten (10) hour days. Overtime on agree ten (10) hour days starts after ten (10) hours.

Section 2. Holidays. The following days shall be recognized as holidays: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, and Christmas Day. All work performed on these recognized holidays shall be paid for at double the regular rate. No work shall be performed on Labor Day except in case of emergency, to protect lives or property, and then only after permission has been requested and granted by the Union or its representative. The Sunday preceding Labor Day, of each year, shall be set aside as, Memorial Sunday in tribute to those Brothers and Sisters who have passed away.

Work on primary and/or general election day shall be governed by the International Union of Painters and Allied Trades District Council 81.

Section 3. Swinging Stage & Scaffolding. The regular rate of pay on exterior swinging stage or scaffolding work seventy five (75) feet or more above ground level shall be designated in the pay schedule for said work.

Section 4. Foreman. The appointment of foreman is the function of the employer, but all foreman shall be practical mechanics of the trade. The employer shall appoint a foreman on any job where three (3) employees and self are working, or three (3) different projects on any one day.

Section 5. Clean-up Time. The contractor shall furnish hand cleaner and clean rags on the job at all times for use of the workers when cleaning up before lunch and quitting time.

Each employee shall be allowed five (5) minutes before lunchtime and ten (10) minutes before quitting time for personal clean-up, in addition to the time it

takes to clean up the employer's tools and equipment before the eight (8) hour day has expired.

8

A ten (10) minute break will be allowed each a.m. to employees. This break shall be taken at their immediate working area. Gathering from various points will not be permitted.

No employee shall change clothes before quitting time.

No employee shall wear his/her paint clothes from home to work or from work to his/her home before or after work, if an adequate place is available for changing clothes. All painters must change to clean and proper uniforms at least once a week.

<u>Section 6. Rollers and Mittens</u>. Mittens without protective linings shall not be used. Roller covers are not to exceed 9" on walls and ceilings, interior and exterior. Wire fences and so forth do not apply.

The District Council 81 Business Representatives shall have access to all jobs at all times during any hours that work is being done on a job and shall be allowed to take up matters of importance with the employees.

The District Council 81 Business Manager or his/her designee will have access to and appoint the steward on all jobs performed by out-of-town contractors or those who are not signatory to this agreement.

There will be no work stoppage unless the Business Manager/Secretary-Treasurer of District Council 81 calls for same.

<u>Section 8. Unemployed Members' Rights</u>. The union agrees that its members shall not work for any contractor or employer who has not complied with all the requirements of this agreement. Nor shall this provision restrict a member from taking work on his/her own during a strike or lockout or when he/she is temporarily unemployed, provided he/she complies with the following procedures:

He/she must be registered at the union office on the unemployed list, and willing to take a job if one becomes available unless he/she gives sufficient reasons of his/her inability to take that particular job.

If a member shall secure a job for himself/herself when unemployed, he/she must report it to the union office before starting the job and after completing it, he/she shall share any work that may last more than eight (8) hours with another unemployed member, if one is available.

But, under no circumstances, shall members out of employment solicit or accept jobs or work from anyone where bids or estimates have been submitted by a contractor signatory to this Agreement with the International Union of Painters and Allied Trades District Council 81.

9

**Section 9. Independent Work.** No employee regularly employed by a contractor shall engage in the trade as an independent contractor or otherwise except as an employee of a contractor who is a party to this agreement, and then only with the knowledge of the Business Manager/Secretary-Treasurer of District Council 81.

**Section 10. Dispensated Members and Differential Wage Rates.** Beneficial, partly beneficial, non-beneficial and honorary members, who age or physical condition debars them from earning the current rate of wages, shall be permitted to work for less, but must first obtain permission of the Trade Board and Local Union before doing so. Any member may come before the Unions' Executive Board for approval. The union will periodically announce this section is available to members.

The wage for this type of workers shall not be less than seventy percent (70%) of the negotiated wage rate.

**Section 11. Subcontracting.** When contractors signatory to this Agreement, subcontract any work out that comes under the Painters jurisdiction, it shall be subcontracted to another contractor signatory to this agreement and done under the terms of this agreement.

Under no circumstances shall a contractor subcontract work to any employee working under the terms of this agreement as a journeyperson.

In the event the subcontractor does not work under the terms and conditions of this agreement, the Union shall have the right to full economic recourse including strike against the employer.

**Section 12. Truck Identification.** The employer agrees to have the name of his/her business firm on each side of all his/her trucks in letters of size legible at a distance of fifty (50) feet.

**Section 13. Job Notices to Union.** To help in having available workers for jobs, the contractor agrees to furnish the union with information on appropriate form (furnished him/her by the Trade Board) regarding commercial jobs of two thousand ($2,000.) or more.

Notice will be mailed to Union office giving:
A. Location
B. Nature of work
C. Approximate starting and completion dates
D. Approximate number of person to be used on jobs

**Section 14. Job Rules.** When workers are called for work by the contractors to report at a specified time, they shall be placed at work, weather conditions

10

permitting, or are paid two hours time.

Employers reserve the right to prohibit the use of radios on the job site.

Section 15.  Hand Tools.  All employees must furnish a scraper, five-inch broad knife, putty knife, hammer, screwdriver, pliers, duster, six-foot rule and other proper tools including tool box and nail set, hard hat, safety glasses, hard soled shoes, broad knives, and two adjustable wrenches.  Any tools other than those listed above, that are furnished by the contractor and checked out to the employee are the responsibility of the employee.  Any tools not returned when called for will be deducted from the employee's check.  Any person who does not have the proper tools will not work until such time as he/she does have them/  He/she will not be paid two hours show-up time if he/she does not have the proper tools and is not allowed to work.

The employer shall arrange for personal fit respirator for their employees.  If the employee has an old respirator for trade-in purposes, the cost of the new special fit respirator shall be withheld from the employees' final payroll check.

Paperhangers will furnish their past board or table (exclusive of vinyl table), straight edge, knives or trimmer, paste brush, syringe and any other necessary hand tools, however, this does not include razor blades.

Section 16.  Employee's Right to Refuse Work.  Employees hereunder shall not be required to work for any contractor when it is known that the contractor works without being accompanied by at least one journeyperson or when any contractor works with the tools on a job with another contractor, and employee's refusal to will not be a violation of this contract.

No more than one member of management, not carrying a current card as a journeyperson member of the Local Union, shall work with tools on the same job.

It shall not be a violation of the contract or cause for discharge, reprimand or discipline for any employee or employees to refuse to work for a contractor who has violated this section.
It shall not be a violation for any employee to refuse to work for any contractor who abuses, or allows his/her foreman to abuse any employee on the job.

Section 17.  During the term of this Agreement, the Union agrees there will be no strikes, picketing or work stoppages of any type.  The employer agrees that there will be no lockouts during the terms of this Agreement.  Nothing in this clause excludes the Union from strikes or picketing in the event that an employer fails to abide by a decision arrived upon through the grievance procedure.

Section 18.  Employees covered by this agreement shall have the right to respect any legal primary picket line validly established by any bona fide labor organization, and the Union party to this agreement has the right to withdraw

11

employees covered by this agreement whenever the employer party to the agreement is involved in a legitimate primary labor dispute with any bona fide labor organization.

## ARTICLE XII.  SAFETY

The parties hereto in behalf of all employers and employees respectively covered by this Collective Bargaining Agreement do hereby agree to comply with all final adjudication's and orders emanating from the federal law entitled Occupational Safety and Health Act; and, also the state law. It being clearly understood that any affective firm or individual expressly reserves his/her or its legal rights and remedies.

Section 1.  Health and Safety Rules.  Fresh drinking water and sanitary cups shall be provided on jobs for working employees.

Drop cloths and wiping rags shall be maintained in a clean condition.

There shall be sanitary toilet facilities on the job or employees shall be allowed time to go to another location for this purpose.

All parties to this Agreement recognize the training/certification requirements of OSHA, NIOSA, Lead Abatement, etc. It is agreed that training/certification is mandatory: First Aid, CPR, Lead Abatement, OSHA 10 hour course, Respiratory Fit Testing, and Pulmonary Exam. Specific sessions will be scheduled and Employees covered by this Agreement will, as a condition of Employment, obtain the necessary training/certification as directed by their Employer and/or District Council 81. Cost of training current and/or new members of District Council 81 shall be paid for by the International Union of Painters and Allied Trades District Council 81 Joint Apprenticeship & Training Fund.

Each card carrying member shall be required to be responsible to the employer to maintain a safe job site by complying with all State, Federal and Local safety regulations, in regards to personal safety equipment. Noncompliance of this section shall subject employee to termination.

Section 2.  Use of Swing Stage.  The following equipment must be furnished on jobs where swing stage is used:

A life or safety line for each person of three-fourth (3/4) inch thick manila rope.
Enough rope to tie back rigging safely.
A railing on all swing scaffold.
No make-shift ladder stages will be used.
Counterweights must be a solid mass and fastened to outriggers.
All Swing scaffold platforms shall be at least eighteen inches wide.

No employee covered by this Agreement shall be allowed to swing or hook up a stage without the help of another employee covered by this Agreement.

12

When necessary to use cables to scaffold within high work or on bridges, interior of buildings, etc., a safety line will be furnished for each worker, and a safety harness for each worker and the employees will be required to wear the harness attached to line.

The lifeline shall be securely fastened above the operation and extend a sufficient distance below to make a safe landing. Manila rope three-fourths (3/4) inch thick shall be used for lifelines on this type of scaffold or swing scaffold.

<u>Section 3. Use of Extension Ladders and Scaffolding.</u> Where extension ladders are used on smooth floors, safety shoes shall be attached to ladders.

No broken ladders or planks shall be used.

Ordinary scaffold plank shall be free from knots and be ten (10) inches wide and planks shall be cleated on both ends.

No plank or scaffold shall be dropped indiscriminately. When lowering plank or scaffold, a rope of sufficient strength shall be used and it shall be let down in a safe manner.

Scaffold sixteen (16) feet or more in height shall be ties in or have outriggers.

<u>Section 4. Spray Regulations and Work Rules.</u> Spray painting is permitted only as follows:

The employer must furnish approved devices and appliance for the protection of the health of the spray painter, except spray masks. Employer shall furnish employee all filters.

All employees will have hair restrained by hair net or hard mat of over collar length and no facial hair within one (1) inch of contact with respirator face piece.

When adequate ventilation and exhaust fans are not possible, each man shall have an approved spray painters' hood, which shall be hooked up to the airline, so clean air may exhaust from the hood at all times of operation.

Spray painter will be allowed reasonable breaks when conditions warrant.

Other painters not spraying will not be required to work close enough to spray applicator to be exposed to the hazards of the spray.

There shall be one person to attend the pot and assist the spray person where needed.

Under no consideration will red lead, white lead, varnish remover, or acids of any type be applied with spray.

Any person refusing to wear a mask while spraying shall be removed from the job at the request of the contractor or business representative of the Union.

The employer shall furnish protective cream to be used on skin, and the employer shall furnish clean rags or towels.

When a journeyperson is designated to accompany State or Federal Safety Inspector on the job, he/she be compensated at his/her regular rate of pay.

Section 5. Special Coatings. At all times when working in a confined area with special coatings, there must be two or more persons working in the area.

## ARTICLE XIII - JOINT TRADE BOARD

Section 1. Bonding. Each contractor signatory to this agreement, and all other employers to whom this agreement becomes applicable, shall furnish a bond from a bonding company licensed to do business in the State of Iowa in the amount of twenty thousand dollars ($20,000.) to guarantee the payments required in this agreement of vacation pay, health and welfare, pensions and wages due to the employees, and any and all funds or trusts, created by this agreement, involving the payments described herein.

All employers employing members of the International Union of Painters and Allied Trades District Council 81 at the time of the execution of this Agreement shall furnish satisfactory evidence of the bond referred to the District Council and to the trustees of the funds applicable on or before May 1, 1998. All other employers to whom this agreement and the provisions thereof shall be applicable shall furnish said bond within fifteen (15) days from the time of employment of any employee under the terms and conditions of this contract.

The bond shall be for the period of this agreement. Each employee, trust fund, or other person or entity having a claim against any contractor under the provisions of this agreement shall notify the District Council 81 Joint Trade Board, in writing of the facts and circumstances of such unpaid obligation.
The Joint Board or its representatives shall, after verification of the indebtedness, process a certification of default to the surety company for payment under the terms of the surety bonds and remit the funds received from the surety company to the person, fund or entity entitled thereto.

Section 2. Insurance. All contractors must carry Workers Compensation and Employers' Liability, Commercial General Liability of no less than $300,000. each occurrence, Automobile Liability; those signatory to this agreement shall pay social security and unemployment insurance regardless of the number of persons employed.

14

Those signatory to this agreement must furnish Certificate of Insurance each year and identification number of unemployment insurance.

Section 3. The Union and the various Painters Associations do hereby establish and agree to maintain a tribunal called the District Council Joint Trade Board for convenience hereafter called the Board, composed of ten (10) members, five (5) appointed by the Association and five (5) appointed by the Union. Each of the parties hereto (i.e. the Union and the Association) may appoint one or more alternates, who, when designated by the appointing party, shall sit in the place of a regular member (who has been appointed by the same party) during such regular members absence or inability to function. The alternate when substituting, shall be vested with the same power and authority as the regular members. All vacancies shall be filled by the Association or Union making the appointment of the member whose position is vacant. Each member shall be subject to removal only by his/her appointing party.

When a non-member signatory to this agreement is charged with violating any of the provisions or conditions of this agreement or any other agreement, indenture or condition related to the Collective Bargaining Agreement between the parties hereto, he/she shall be given the right to designate another non-member signatory to this Agreement, in good standing, to sit in the place and instead of one Association designate member of the Board, for the purpose of hearing and determining the particular charge or charges; in such an event the Association shall temporarily remove one of its appointed member of the Board to give affect to the aforementioned objective. The non-member signatory designated shall be vested with the same powers and authority as held by the other members of the Board.
Six members - three (3) Union appointees and three (3) Association appointees shall constitute a quorum. For quorum purposes, when a non-member signators designee is acting as a Board member, he/she shall be deemed an Association appointee.

Decisions of the Board shall be determined by a majority vote;
providing that the Association and Union appointees respectively have equal voting strength with respect to such vote.

The members of the Board shall annually elect a Chairperson and a Secretary, provided that one of such officers is a Union appointee and the other is an Association appointee.

Section 4. The Board is empowered and vested with the authority to investigate, hear and determine all questions, disputes and grievances, arising from this agreement or any extensions or renewals thereof concerning any of the terms and conditions of any related or incidental agreement or indenture between the parties hereto as well as between the Union and any other signator and party to this agreement.

15

The Board is further empowered to award, assess and impose penalties, damages and remedies for violations of this agreement or any extension or renewal hereof or of any of the provisions of any related or incidental agreements or indentures; to issue any interpretative rulings pertaining to any of the provisions of the aforementioned documents; and to make and adopt and prescribe such rules and rulings as it may deem necessary to give appropriate full force and effect to the intent and purposes of this and the aforesaid agreements; to examine or cause the examination of employer and union records which are material to the issues in dispute; to adopt and enforce all rules of conduct and procedure with respect to all matters and parties and witnesses; to appoint, employ and engage such personnel as may be necessary to carry out its duties and functions; to require all parties to a given dispute to testify under oath before a Notary Public present at the hearing or by separate affidavit; without limiting the powers of the Board, to require a violating employer to post a cash or surety bond to insure his/her future compliance with the contractual provisions he/she violated.

Section 5. The Trade Board shall have the power to demand and receive the payroll records of any and all contractors who are members of the Association, have signed this, or have been granted a Certificate of Compliance.

The Trade Board shall have the power to demand and examine the pay check and withholding slip of any journeyperson or apprentice member of the Union at the time such pay is received, or at any time thereafter.

Section 6. All complaints, charges, grievances and disputes shall be filed within 48 hours or occurrence with the Secretary of the Board in writing, setting forth all pertinent details, and a true copy of same shall be furnished to the party against whom the charge is made; a reasonable period shall be allowed for answer to the charges, and such answer must be in writing and filed with the Secretary of

the Board within five (5) days after receiving the charges, and a true copy of such answer shall be furnished to the complainant with the same five (5) days. Reasonable notice of hearing in writing shall be given to all parties concerned. There shall not be work stoppage during the pendency before the Local Joint Trade Board.

No Union representative shall sit as a Board member in any case involving him/her or his/her employer, directly or indirectly; and no employer representative shall sit as a Board member in any case involving him/her or any of his/her employees, directly or indirectly.

Section 7. The findings, interpretations, decisions, awards, orders and determinations of the Board shall be final and binding upon all parties concerned, subject only to the rights of the parties to appeal (as herein

16

provided) and subject to the applicable laws of the State pertaining to Arbitration.

All findings, interpretations, decisions, awards and determinations shall be rendered in writing and signed by the members of the Board or by the Chairperson and Secretary of the Board. A true copy of same shall be sent to each affected party by registered or certified mail.

Section 9. If the grievance cannot be settled by the Joint Trade Board within twenty-four (24) hours the matter will be referred to an Arbitrator selected through the Federal Mediation and Conciliation Service for a final ruling with costs assessed and paid by the party requesting arbitration. All decisions shall be final and binding.

The Joint National Board is hereby authorized and empowered to delegate any question or issued submitted, to a committee of two (2) or more, one-half (1/2) of whom shall be appointed by each of the respective presidents of the Brotherhood and the Association, for the purpose of investigating, making recommendations to the National Board, or, in fact, resolving or determining the particular issue or issues, which determination shall be binding with the same force and effect as though rendered by the Board itself.

Section 10. Finances of the Board shall be derived from fees, assessments, fines or levies, except for assessment of actual damages imposed by the Board, as well as contributions to be made by each employer who is a party to or is bound otherwise by the terms and conditions of this agreement, such contribution to be:

a. Each application for registration certificate or shop card shall be on a form prescribed by the Trade Board and shall be accompanied by an initial fee of one hundred dollars ($100.00).

b. Issuance of registration certificate or shop card. Upon receipt of application for registration certificate or shop card, full payment of fee, and upon satisfactorily showing that the contractor has complied with all of the insurance and bonding requirements contained herein, and that the applicant is a bona-fide employer as described herein and the he/she employs at least one journeyperson painter, the Trade Board may issue a registration certificate or shop card upon his/her signing a counterpart of this Agreement.

c. Renewal. The registration certificate or shop card shall be renewed annually on or before May 1, of each year, providing the employer as herein defined has shown proof of the insurance and bonding requirements as set forth, and shall be issued upon payment of ten dollars ($10.00) renewal fee.

In the event there is a deficit in the financial operation of the Board, such deficit shall be borne equally by the Union and the Association, providing that such

17

deficit expenditures have been approved by the Union and the Association.

Section 11. Certificate of Compliance. A non-resident contractor seeking to do business in the jurisdiction of the International Union of Painters and Allied Trades District Council 81, AFL-CIO having jurisdiction, at his/her principal place of business.

Section 12. Payroll Records.

a. Forms. Payroll forms shall show quarterly earnings with all hours shown as regular or overtime, rates, regular and overtime and all earnings and deductions shown and identified as such.

b. Checks. The Contractor must use a regular check with attached withholding and deduction slips bearing the number and date corresponding with the number and date of the check, showing all deductions withheld.

## ARTICLE XIV - EDUCATIONAL PROGRAMS

The Employers and the Union hereby establish/maintain an Apprenticeship and Training Fund to be known as the International Union of Painters and Allied Trades District Council 81, hereinafter referred to as the Apprenticeship and Training Fund under a Trust Agreement attached hereto as Exhibit A and made a part hereof.

Section 1.(a.) Commencing with the first day of May, 2001, and for the duration of this Agreement, and any renewals or extensions thereof, the Employer, as defined in the Agreement and Declaration of Trust executed by and between the International Union of Painters and Allied Trades District Council 81, agrees to make payments to the International Union of Painters and Allied Trades District Council 81 Apprenticeship and Training Fund for each employee covered by this agreement, as follows:

> (1) For each hour or hour for which an employee receives pay, the Employer shall make a contribution of ten (10) cents to the above named Apprenticeship and Training Fund for the first year, an additional five (5) cents for a total of fifteen (15) cents for the second year, and an additional five (5) cents for a total of twenty (20) cents for the third year.
>
> (2) Contributions shall be paid on behalf of any employee starting with the employee's first hour of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices, journeymen, trainees and probationary employees.
>
> (3) The payments to the Apprenticeship and Training Fund required above shall be made to the International Union of Painters and Allied Trades District Council 81 Apprenticeship and Training Fund which was established under an Agreement and Declaration of

18

Trust, dated May 1, 2001. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as though he had actually signed the same.

(4) From the funds collected in the above manner, the Trustees of the International Union of Painters and Allied Trades District Council 81 Trust shall hold in trust the sum of five cents (5) per hour for each hour or portion of an hour for which an employee receives pay, and remit said sum to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) at such regular periods of time and in the manner and form as shall be determined by the Trustees of the International Fund.

(5) The payments to the International Fund required in paragraph (1)(a)(4) above shall be made to the IUPAT-JATF, which was established under an Agreement and Declaration of Trust dated May 1, 1995. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as though it has actually signed the same.

(b) The Employer hereby irrevocably designates as its representatives on the Board of Trustees of the IUPAT-JATF such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

(c ) The Union hereby irrevocably designates as its representatives on the Board of Trustees of the IUPAT-JATF such Trustees as are now serving, or who will in the future serve, as Union Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

(d) The parties hereto further agree to be bound by all actions taken by the Trustees of the IUPAT-JATF pursuant to the said Agreement and Declaration of Trust.

<u>Section 2.</u> All contributions shall be made at such time and in such manner as the Trustees require, and the Trustees shall have the authority to have a Certified Public Accountant audit the payroll and wage records of the Employer for the

Employer for the purpose of determining the accuracy of contributions to the Apprenticeship Fund.

<u>Section 3.</u> If an Employer fails to make contributions to the District Council 81 Trust within twenty (20) days after the date required by the Trustees, such failure shall be deemed a violation of this agreement, and the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provisions hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collecting the payments due together with the attorney's fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause, which may be provided or set forth elsewhere in this Agreement.

19

Section 4. The Apprenticeship Plan adopted by the Trustees of said Apprenticeship Funds shall at all times conform with the requirements of the Internal Revenue Code and other applicable laws and regulations so as to enable the Employer at all times to treat contributions to the Apprenticeship Fund as a deduction for income tax purposes.

The Employer hereby irrevocably designates as its representatives on the Board of Trustees of the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund, such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

Section 5. Apprentice.
a. Definition of Apprentice. The term "Apprentice" as herein applied shall be defined as any person who may be employed by an employer subject to the rules and conditions as set out in these working rules, the Apprenticeship Standards and the Constitution of the International Union of Painters and Allied Trades District Council 81, AFL-CIO CLC.

b. Number of Apprentices Permitted. Each Employer shall employ and train apprentices in the following ratio to journey workers employed in the shops:
1 apprentice per (3) three journey workers
2 apprentices per (6) six journey workers(etc.)

c. Compliance with General Constitution. All apprentices must comply with Sections 94 through 98 of the Constitution of the International Union of Painters and Allied Trades, AFL-CIO.

d. Hiring of Apprentices. Contractors who hire apprentices must obtain them through the Joint Apprentice Council. Contractors who hire apprentices must join and continue in good standing as members of the Council for the duration of this Agreement.

e. An Apprentice shall not work alone for more than four (4) hours until his third (3rd) year.

f. No apprentice shall act in capacity as foreman, during the first two (2) years of Apprenticeship.

g. It is agreed apprentices shall receive 144 hours per year of schooling given by the Joint Apprenticeship Council and approximately 1600 hours per year on-the-job training.

## COMPENSATION OF APPRENTICES

### Rate of Pay

20

| | | | | |
|---|---|---|---|---|
| 1st - 6 months | 40% | | 4th - 6 months | 55% |
| 2nd - 6 months | 45% | | 5th - 6 months | 65% |
| 3rd - 6 months | 50% | | 6th - 6 months | 75% |

After completion of the 7th and 8th - 6 months each at 85%, the Apprentice shall receive journeyperson scale.

## Section 6. Student Employment.

a. Who May be Employed.  A Contractor may employ a student between the ages of 16 and 25 years during the months of June, July and August, provided the student is regularly enrolled in an accredited school or college and is in the vacation period between school terms.

b. Contractors Eligible to Employ Students.  A Contractor shall have employed eight or more members of International Union of Painters and Allied Trades District Council 81 during the major portion of the past twelve (12) month period and have at least one regular, registered apprentice in the Painters Apprentice

Program in his/her employ for the past twelve (12) months.  A contractor having members of District Council 81 employed the major portion of the past twelve (12) months and one or more apprentices employed during the past twelve (12) months, may employ one (1) student.

No Contractor shall have in his/her employ more than two (2) student employees.

c. Statement of Employment Required.  Prior to employment of such student, the prospective employee must be interviewed by the Business Representative of District Council 81 and fill out a statement pertaining to his/her background, reason for requesting such education, and if he/she has ever worked at the paint trade, for how long.  Such statement will be notarized and copy sent to the employer.

d. Compensation of Student Employee.  A student employee shall be paid the rate of forty percent (40%) of journeypersons rate.

## Section 7. Utility Persons.

a. Utility persons will be limited to registered jobs with the Union, and only jobs that are being bid by non-union contractors.  Utility persons will be limited to jobs approved by the Union's Representative or by a Special Board.  They cannot be on a job, without a union journeyperson member present.

b. On designated utility jobs, there shall be no pickets or work stoppages for any reason.  The journeypersons assigned to project shall be allowed to continue work during any strike.

c. Any contractor who fails to register such a job for approval of the Union's Representative or misuses this provision shall be subject to charges before the Joint Trade Board. If convicted, the Contractor shall be subject to a minimum fine of from five hundred dollars ($500.00) to five thousand dollars ($5,000.00) or disciplinary action as the Board feels necessary. It will be the responsibility of the Contractor's Association as well as the Union to enforce this Article and Section of Contract. All monies to be paid directly to the International Union of Painters and Allied Trades District Council 81.

d. Special Board shall consist of three (3) union members and three (3) contractors who will periodically review the rules and jobs being performed under this Section, and develop guidelines to utilize this provision.

## ARTICLE XV – BENEFIT FUND CONTRIBUTIONS

<u>Section 1.</u>  All Employers signatory to this working agreement or a Participation Agreement shall contribute Two Dollars and Fifty Cents ($2.50) to the **Painters District Council 81 Health and Welfare Fund (Fund)** for each hour worked by each employer employee eligible to participate in the Fund. Eligible participants are those employees who, on the day of execution of this Agreement, through no **choice** of their own, are **not** an eligible dependant under a Group Health Plan in which the employee's spouse or partner is the eligible Participant; or who subsequent to the day of execution of this agreement **ceases** to be such eligible dependant through **no choice** on the part of the employee dependant. It shall be presumed that an employee is eligible as a Health and Welfare Fund participant unless the employee can demonstrate that the employee is not eligible as a Health and Welfare Fund participant through **no choice** on the part of the employee. Employers signatory to this agreement and Employers who are not signatory to this agreement but are working under the terms of this agreement and have signed a participation agreement with respect to the making of contributions to the Fund, shall as part of making said contributions be considered as having appointed the employer Trustees of the Health and Welfare Fund as their Trustees and as having adopted the terms of the Agreement and Declaration of Trust of said Fund and agree to abide by the same. Contributions and reports to the Fund shall be sent to the address directed by the Trustees and checks for said contributions shall be made payable as directed by the Trustees.

<u>Section 2.</u>  All Employers signatory to this working agreement or a Participation Agreement shall contribute Two Dollars and Fifty Cents ($2.50) to the **Painters District Council 81 Retirement Savings Fund (Fund)** for each hour worked by each employer employee eligible to participate in the Fund. Eligible participants are those employees who are **not eligible to participate in the District Council 81 Health and Welfare Fund.** Employers signatory to this agreement and Employers who are not signatory to this agreement but are working under the terms of this agreement and have signed a participation agreement with respect to the making of contributions to the Fund shall as part of making said contributions be

considered as having appointed the employer Trustees of the Retirement Savings Fund as their Trustees and as having adopted the terms of the Agreement and Declaration of Trust of said Fund and agree to abide by the same. Contributions and reports to the Fund shall be sent to the address directed by the Trustees and checks for said contributions shall be made payable as directed by the Trustees.

Section 3.  Employers signatory to this Agreement and those employers working under a Participation Agreement agree that employees working pursuant to this Agreement or a Participation Agreement may elect to participate in the Painters District Council 81 401(k) Fund Deferred Savings Plan by signing a Tax Deferred Savings Authorization Form provided by the Fund Trustees directing the signatory employer to reduce the employee's hourly pay by Fifty Cents ($0.50) per hour or multiples of Fifty Cents ($0.50) per hour to a maximum as allowed under the Internal Revenue Code. Employees may change the amount of the Tax Deferred Savings at the beginning of the payroll week immediately after January 1 in any year this Contract is in effect, in units of Fifty Cents ($0.50) per hour, but in no case shall the amount be greater than allowed under the Internal Revenue Code. An employee may elect a tax-deferred savings at the time an employee initially commences employment with any employer. Employee election to have tax deferred savings transferred to the 401(k) Plan must be made in writing at least ten (10) days prior to the stated election day, which is annual, other than initial employment. All tax-deferred savings requests must be filed by the employee with the employer with a copy as directed by the Fund Trustees.  An Employee may cease such deferrals at any time by giving written notice to the Employer.  However, the Employee may not again elect deferrals until the beginning of the ensuing calendar year.  Employers signatory to this working agreement and Employers who are not signatory to this agreement but are working under the terms of this agreement and have signed a participation agreement with respect to the making of contributions to the Fund, shall as part of making said contributions be considered as having appointed the employer Trustees of the Retirement Savings Fund as their Trustees and as having adopted the terms of the Agreement and Declaration of Trust of said Fund and agree to abide by the same.  Contributions and reports to the Fund shall be sent to the address directed by the Trustees and checks for said contributions shall be made payable as directed by the Trustees.

Section 4.  Contributions and deferrals to the above Funds shall be made on behalf of each employee to the Third-Party Administrator (TPA) mutually agreed upon by each of the Funds, which TPA shall verify employee eligibility upon independent investigation pursuant to the foregoing as well as rules and regulations established by the Trustees of the Funds. Said contributions shall be made in the form of one check for the total of all contributions to the Funds and shall be reported on one form in the manner mutually designated by the Trustees of the Funds. Such contributions shall be received by the TPA no later than the 15th of the month following the month the contributions accrued. Contributions not received by the 15th of the month shall be considered as delinquent and the delinquent Employer shall be assessed a penalty in the

amount of 20% of the contributions, which were due. Said penalty shall be paid within 5 days of demand by the TPA, otherwise the TPA shall turn the same over to the attorney named by the Trustees for collection and the delinquent employer shall pay in addition, the costs of collection including court cost, attorney fees and accounting fees if the Trustees determine in their sole discretion to have a payroll audit performed on the delinquent employer. If an employer is delinquent in contributions more than three times during the term of this agreement the Trustees of each Fund shall determine, in their sole discretion, the amount and period of a cash bond to be posted by the employer with each of the Funds to guarantee future contribution payments.

## ARTICLE XVI- UNION AND INDUSTRY NATIONAL PENSION FUND

Section 1. a. Commencing with the 1st day of January 1993 and for the duration of this agreement, and any renewals or extensions thereof, the Employer agrees to make payments to the International Union of Painters and Allied Trades Union and Industry National Pension Fund for each employee by this Agreement as follows:

b. For each hour or portion thereof, for which an employee received pay, the Employer shall make a contribution of two dollar ($2.25) to the above Pension Fund.

c. For the purpose of this Article, each hour for which pay is received by the employee in accordance with this Agreement, shall be counted as hours for which contributions are payable.

d. Contributions shall be paid on behalf of any journeyperson or apprentice member of District Council 81 covered by this Agreement, starting with the first day of employment.

e. The payments to the Pension Fund required above shall be made on the International Union of Painters and Allied Trades Union and Industry National Pension Fund, which was established under an Agreement and Declaration of trust, dated April 1967. The employer hereby agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust, as though he/she had actually signed the same.

Section 2. The employer hereby irrevocably designates as its' representative of the Board of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustee, together with their successors. The Employer further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust.

Section 3. All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees shall have the authority to have an

24

independent Certified Public Account audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Pension Fund.

Section 4. If an employer fails to make contributions to the Pension Fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary norwithstanding, and the Employer shall be liable for all costs for collecting the payments due together with attorneys' fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided or set forth elsewhere in this Agreement.

Section 5. The Pension Fund adopted by the Trustees of said Pension Fund shall at all times conform with the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat contributions to the Pension Fund as a deduction for income tax purposes.

## ARTICLE XVII- LABOR MANAGEMENT COOPERATION FUND

Section 1. Commencing with the 1st day of May 1, 2001, and for the duration of this Agreement, and any renewals or extension thereof, the Employer agrees to make payments to The Painters and Allied Trades Labor-Management Cooperation Fund ("Fund") for each employee covered by this Agreement, as follows: For each hour or portion thereof, for which an employee received pay, the Employer shall make a contribution of five cents ($0.05) to the Fund. For the purpose of this Article, each hour paid for, including hours attributable to show up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable. Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices, helpers, trainees, and probationary employees. The Employer and Union signatory to this Agreement agree to be bound by and to the Agreement and Declaration of Trust, as amended from time to time, establishing the Fund.

Section 2. The Employer hereby irrevocably designates as its representative on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.

Section 3. All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees may at any time conduct an audit in accordance with the Agreement and Declaration of Trust.

Section 4. If any Employer fails to make contributions to the Fund within twenty days after the date required by the Trustees, the Union shall have the right to

25

take whatever steps are necessary to secure compliance with this Agreement, any other provisions hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due together with

attorney fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause, which may be provided or set forth elsewhere in this Agreement.

## ARTICLE XVIII - CHECK-OFF ADMINISTRATIVE DUES

Section 1. Every employer signatory to this Agreement hereby agrees to check-off from the wages of any employee employed by such employer during the term of this Agreement administrative dues in the amount specified in the District Council's Bylaws and to remit said amount to the Union in the following manner:

a. Administrative Dues Check-off will be four percent (4%) of the gross income. The Union will submit to the employer a copy of the Bylaws or the applicable Bylaw provision upon request of the employer.

b. For each payroll period, the employer will deduct from the wages of each employee the amount specified in the Bylaws based on the amount of gross income during said payroll period, and will accumulate said deductions to the end of the month.

c. On or before the fifteenth (15) day of each month, the employer will remit to the Union the entire amount of administrative dues due and owing as to each employee for the month previous, together with a list of employees covered hereby and the number of hours by each during the applicable period.

Section 2. When a signatory employer performs a job within the jurisdiction of a Union affiliated with the Brotherhood of Painters and Allied Trades, other than the Union signatory hereto and the Bylaws of that other Union contain a provision for administrative dues or business representative "assessment", the employer shall check-off from the wages of employees covered by this Agreement and employer on that job, administrative dues or business representative "assessment" in the amount stated in that other Union's Bylaws, and shall remit said amount to that other Union. In that event, that other Union shall be acting as agent of the signator of the Union for the purpose of policing and administering this Agreement. In performing the check-off, the procedure specified in Section 1 a.-c. will be followed, except that it shall be the responsibility of said other Union to notify the employer in writing of the amount of administrative dues or business representative "assessment" specified in its Bylaws, and to submit to the employer a copy of the Bylaws or the applicable Bylaw provision. When the signatory employer performs a job within the jurisdiction of a Union affiliated with the Brotherhood of Painters and Allied Trades other than the Union signatory hereto, and the Bylaws of that other Union

26

contains no provision employer shall continue to be bound by Section 1.

Section 3. The obligation of the employer under Sections 1 & 2 shall apply only as to employees who have voluntarily signed a valid dues deduction authorization card.

Section 4. At the time of the employment of any employee, the employer will submit to each such employees for his voluntary signature, a dues deduction authorization card in duplicate, one copy of which is retained by the employer, and the other returned to the Union, the form is to be supplied by the Union.

Section 5. On or before the fifteenth (15) day of each month, the employer will submit to the Union a list of all employees covered by the Agreement who have not signed a dues deduction authorization card, together with the number of hours worked by each such employee during the month previous.

## ARTICLE XIX - COMPENSATION.
## TERRITORIAL JURISDICTION OF LOCAL UNION 246

Section 1. Wage Rates

Base pay for all journeyperson painters for year 1  $ 19.60

Base pay for all journeyperson painters for year 2  $ 20.15

Base pay for all journeyperson painters for year 3  $ 20.70

If 50% or more of an employee's daily work hours fall outside the normal work hours of 8:00 A.M. to 4:30 P.M., the rate of pay shall be base pay plus $.25 for all hours worked that shift.

Section 2. Particular Classifications

Brush & Roll – Apprentice/Journeyperson rate refer to Section 1-Wage Rates
Sandblaster – Apprentice/Journeyperson rate plus $0.50
Vinylhangers/Paperhangers – Apprentice/Journeyperson rate
Spray Painter – Apprentice/Journeyperson rate plus $0.50
Swing Stage – Apprentice/Journeyperson rate plus $0.50
Boatswain Chair – Apprentice/Journeyperson rate plus $0.50
Window Jack – Apprentice/Journeyperson rate plus $0.50
Foreman Rate – Journeyperson rate plus $0.50
Ladder work over two stories – Apprentice/Journeyperson rate plus $0.50
Structural Steel and Bridge (where cooned and more than 20 feet above solid base) – Apprentice/Journeyperson rate plus $0.50
Cable scaffold over twenty feet above a solid base - Journeyperson rate plus $0.50
Work over 75 feet – Apprentice/Journeyperson rate plus $1.10

27

An employee working in more than one of the classifications set out in Section 2, during the same hour, shall receive the pay of the classification receiving the highest additional pay.

Section 3. Subsistence.  When the employee is working out of town over seventy-five (75) miles and does not return home each day, the company shall supply reasonable living quarters to the employee, plus ten dollars ($10.00) subsistence pay for each day.

Section 4.  Car Allowance.

a.  No car expense shall be paid when the city limits of the job site is less than forty (40) miles from the closest city limits of the principal place of business of the Contractor.

b.  Employee's providing a vehicle, who are required to travel to a job site that is more than forty (40) miles but less than sixty (60) miles from the city limits of the employer's principal place of business to the city limits of the job site, shall be paid gas expenses.

c.  Employee's providing a vehicle, who are required to travel to a job site that is more than sixty (60) miles from the city limit of the employer's principal place of business to the city limit of the employer's principal place of business to the city limits of the job site, shall be paid the mileage rate established by the State of Iowa, for all miles traveled that day.

d.  A paper hanger who hauls his own tools and equipment from job to job during the eight (8) hour work day shall receive mileage at the rate allowed by the State of Iowa with a minimum of one dollar ($1.00) for any move, in addition to his regular pay.

e.  Where the journeyperson owns his/her own car or truck and uses it for his/her transportation, he/she shall be held to the same rule with reference to the transportation of materials, tools and equipment as it applies to the journeyperson owning his/her own car, unless he/she is compensated by the contractor for transporting same.  (Excluding ladders or scaffolding on car.)

f.  No employee shall be required to work more than thirty (30) consecutive working days at any one time outside the city limits of the principal place of business of the contractor for which no travel pay is allowed, except by his/her own voluntary act.

Section 5. Pay Day.
a.  The regular pay day shall be once each week on or before Friday and the wages shall be paid before quitting time at the job site.

b. Employers may withhold no more than three (3) days pay due, to enable them to prepare the payroll.

c. When employees are laid-off or discharged, they shall be paid in full on the job immediately and if required to go to some other point, they shall be paid for such time as required to go to such place.

d. When employees quit of their own accord, the employer may wait until the next regular pay day to pay the wages dues them.

e. Any undue expense of loss of time in being paid, caused through the employers negligence, shall be paid for by the employer causing the delay.

f. An employer whose pay check have been dishonored at the bank may be required by the Trade Board upon the request of the Business Representative of the Union, to make payment by certified check or cash payment with statement of employees' hours worked and deductions as a condition of its registration certificate or shop card, and in additional shall be liable for the immediate payment of all dishonored checks and reimbursement to the employee for the cost of collection.

## ARTICLE XX - RESIDENTIAL.

Section 1. Residential rate to include certain apartment complexes.

Section 2. Journeyperson painters will be paid a minimum of ten dollars ($10.00) per hour plus benefits and premiums.

Section 3. No journeyperson will be forced to work residential. If pressure is applied by a Contractor in an attempt to force a journeyperson to work residential a grievance will be filed on behalf of the journeyperson by District Council 81.

Section 4. Residential bidding will be allowed on a job to job basis only after permission has been granted by the Business Manager/Secretary-Treasurer of District Council 81.

## ARTICLE XXI - RENEGOTIATION IF INVALIDATED BY COURT

If any section or article of this agreement or anyone of its riders or amendments hereto shall be held invalid by operation of law or by any tribunal or competent jurisdiction or if compliance with or enforcement of any article or section should

be restrained by any such tribunal pending final determination of its validity, the remainder of such section or article pertaining to persons or circumstances other than those to which it has been invalid, or as to which compliance with or enforcement of has been restrained, shall not be affected thereby. In the event

29

any article or section is held invalid or unenforceable in compliance and which has been held invalid, or as to which compliance with or enforcement of, has been restrained, shall not be affected thereby.

In the event any article or section is held invalid or unenforceable in compliance and which has been restrained as set forth, the parties affected thereby shall enter into an immediate collective bargaining negotiation upon request of the Union, for the purpose of arriving at a mutually satisfactory replacement, either party shall be permitted all legal or economic recourse to support of its demands notwithstanding any provisions of this contract to the contrary.

### ARTICLE XXII - UNION OPTION

The members of District Council 81, after serving a property thirty (30) day advance notice to the signatory contractors, may collectively on an annual basis apply a portion of their hourly rate of pay to benefits, including, but not limited to, pension, annuities and health and welfare benefits.

### ARTICLE XXIII- EMPLOYEE MEDICAL FUND

The Joint Trade Board shall establish a separate fund for the purpose of paying for all current and future members of Local Unions affiliated with District Council 81 to have all medical tests required by State and Federal laws and also any condition of employment as may be required. This fund shall be established, and maintained solely by contributions from the Des Moines Master Painters Association and by all other contractors who are covered by the terms of this Agreement. A Trust Agreement shall be drawn to govern the administrative intent of this section, with the Joint Trade Board to serve as the fund's trustees.

### ARTICLE XXIV - MARKET RECOVERY

In the event conditions impact on the industry, requiring a market recovery program, the parties signatory to this agreement, shall meet upon request, to negotiate mutual terms. This agreement shall continue until such mutual terms are agreed to.

### ARTICLE XXV – DURATION

This Agreement shall be binding on both parties beginning May 1, 2001 and running to and including April 30, 2004. Should either party desire any change at the expiration of this Agreement, it is agreed that sixty (60) days notice prior to the modification or termination of this Agreement is to be given the Contractor or the Union by registered mail. Either party requesting such change shall designate time and place when negotiations for such change shall be held. Negotiations must commence within ten (10) days after such notification. In case neither party notifies the other party as stated above, this Agreement shall be in full force from year to year.

## A C K N O W L E D G E M E N T

Agreed upon this ___1st___ day of May, ___2001___

_____ for DES MOINES MASTER PAINTERS ASSOCIATION
President

_____ for I.U.P.A.T. District Council 81
Business Manager/Secretary-Treasurer

_____ for
_____
Authorized Signature                    Company Name

31

## INDEX

ARTICLE I

ARTICLE II -          WITNESSETH

ARTICLE III -         RECOGNITION CLAUSES

ARTICLE IV -         CONDITIONS

ARTICLE V -          JURISDICTION

ARTICLE VI -         UNION SECURITY UPON REPEAL OF EXISTING LAW

ARTICLE VII -        ANTI-DISCRIMINATION CLAUSE

ARTICLE VIII -       CONTRACTS AND JOBS OUTSIDE OF LOCAL JURISDICTION

ARTICLE IX -         PRESERVATION OF WORK

ARTICLE X -          REFERRAL CLAUSE

ARTICLE XI -         WORKING RULES

ARTICLE XII -        SAFETY

ARTICLE XIII -       JOINT TRADE BOARD

ARTICLE XIV -        EDUCATIONAL PROGRAMS

ARTICLE XV --        BENEFIT FUND CONTRIBUTIONS

ARTICLE XVI -        UNION AND INDUSTRY NATIONAL PENSION FUND

ARTICLE XVII -       LABOR MANAGEMENT COOPERATION FUND

ARTICLE XVIII -      CHECK - OFF OF ADMINISTRATIVE DUES

ARTICLE XIX -        COMPENSATION

ARTICLE XX -         RESIDENTIAL

ARTICLE XXI -        RENEGOTIATION IF INVALIDATED BY COURT

ARTICLE XXII -       UNION OPTION

ARTICLE XXIII -     EMPLOYEE MEDICAL FUND

ARTICLE XXIV -     MARKET RECOVERY

ARTICLE XXV -      DURATION

## Addendum

### Drug Testing

The employer shall be free to establish a drug and alcohol testing program for all employees covered by this Agreement. The program shall conform to state and federal regulations. The employer shall pay for all tests required.

### A C K N O W L E D G E M E N T

Agreed upon this _1st_ day of May, _2001_

_____ for DES MOINES MASTER PAINTERS ASSOCIATION

President

_____ for I.U.P.A.T. District Council 81

Business Manager/Secretary-Treasurer

_____ for

_____

Authorized Signature          Company Name

34

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL PAINTERS AND ALLIED )
TRADES INDUSTRY PENSION FUND )
                                           )
                    Plaintiff, )       CIVIL ACTION NO.
      v.                       )       06-02167 (JDB)
                                             )
ALLIED PROFESSIONAL SERVICES, INC )
    a/k/a Allied Services                  )
                                             )
                    Defendants. )

## DECLARATION OF SANFORD G. ROSENTHAL

Sanford G. Rosenthal, Esquire declares and states, the following:

1.       I am a shareholder with the law firm of Jennings Sigmond, P.C. and presently serve as counsel to the International Painters and Allied Trades Industry Pension Fund ("Pension Fund") in this case. I am submitting this Declaration to document the attorneys' fees and costs which the Pension Fund has incurred in this case through February 14, 2007.

2.       Attached as Exhibit 4 to Plaintiff's Motion for Entry of Judgment by Default, and incorporated herein by reference, is a list showing all work performed by the office of Jennings Sigmond, P.C. and related costs in connection with the preparation of the Complaint and the Motion for Entry of Judgment by Default against Allied Professional Services, Inc. a/k/a Allied Services in this action through February 14, 2007. The listing was prepared from contemporaneous attorney time and expenses records and bills, the originals of which are maintained in the regular business records of Jennings Sigmond, P.C. Each piece of work is separately coded and the work performed is described. The fees relevant to this case are $1,574.00 and expenses are $506.54 for a total of $2,080.54.

179854-1



3.    The identity of those performing services related to this matter and normal hourly rates are as follows.

| INITIALS | NAME | TITLE | HOURLY RATE |
|----------|------|-------|-------------|
| SMC | Shanna M. Cramer | Associate | $200.00 |
| EAC | Elizabeth A. Coleman | Associate | $200.00 |
| CTM | Cathy T. Morton | Paralegal | $ 70.00 |

4.    Plaintiffs only seek judgment for fees in the bills, which reflect a special fee schedule with the International Painters and Allied Trades Industry Pension Fund for a uniform $200.00 per hour rate for all lawyers and $70.00 per hour for paralegals and clerks.

Attorney Background and Experience

5.    Sanford G. Rosenthal. Sanford G. Rosenthal is a firm shareholder and co-leader of the ERISA practice and has practiced law for 23 years. He received his undergraduate education at Pennsylvania State University, where he graduated in 1971. He worked as Audit Manager and Office Manager in the administrative team for the Teamsters Health and Welfare and Pension Funds of Philadelphia and Vicinity from 1971 through 1980. Mr. Rosenthal attended the Dickinson School of Law, where he was awarded the Degree of Juris Doctor in 1983. Mr. Rosenthal is a member of the Bar of the Supreme Court of Pennsylvania and the District of Columbia Bar. He is also admitted to practice before the United States Court of Appeals for the Third Circuit and the United States District Courts for the Eastern and Middle Districts of Pennsylvania. His practice concentrates on the representation of multiemployer benefit funds in delinquency litigation and counseling. A sample of his litigation experience is available in 32 published cases that be obtained through a Westlaw search for "AT ("Sanford G. Rosenthal") and Jennings" in the FPENS-CS library.

6.    <u>Shanna M. Cramer</u>. Shanna M. Cramer, an associate in the firm, has actively practiced law for three (3) years. She graduated in 1997 from Rutgers University, with honors, with a Bachelors Degree in History, Political Science and Spanish.  She received her law degree in 2001 from Rutgers Law School. Ms. Cramer graduated in 2004 from Beasley School of Law-Temple University, with an LL.M in Taxation. Ms. Cramer has been admitted to the Bars of Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania.

7.    <u>Elizabeth A. Coleman.</u> Elizabeth A. Coleman is an associate. She graduated in 1999 from Muhlenberg College and received her law degree in 2005 from Villanova University School of Law. She served as Associate Editor of Student Work for the Environmental Law Journal.  Her Note, "In re Hoery v United States: Compensating Homeowners For Loss of Property Value Due to Toxic Pollution under The Continuing Tort Doctrine" was published in the Villanova Environmental Law Journal in 2005.  During law school Ms. Coleman served as a judicial intern for the honorable Susan Peikes Gantman of the Pennsylvania Superior Court. Following law school, she served as a judicial law clerk for the Honorable Albert J. Snite, Jr, in the Philadelphia Court of Common Pleas, Criminal Trial Division.  Ms. Coleman has been admitted to the Bars of Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania.

8.    <u>Catherine T. Morton</u>. Catherine T. Morton is a Paralegal in the Jennings Sigmond office. She has been with the office for six (6) years and is experienced in corporate computer database research, electronic filing procedures throughout the country and preparation and documentation of service of complaints and other pleadings for employee benefit collections matters, in addition to other skills.

179854-1

3

Legal Market Benchmark

9.      The time and fees charged in this case are reasonable based on prevailing market rates for similar services by lawyers of reasonably comparable skill, experience and reputation in both the Philadelphia and District of Columbia markets.

10.     My opinion that the time and fees are reasonable is based on a number of factors, including the following.

(a)      We serve as counsel or co-counsel to over 20 multiemployer employee benefit funds groups.  The firm currently has 17 lawyers, with a dedicated benefits department of seven (7) lawyers plus part-time work by three (3) other lawyers in the labor practice.  The work is specialized and our competition often is large corporate firms with both employee benefits and federal litigation experience.  In my experience, our fees are normally are substantially lower than the charges of larger firms.

(b)      The flat rate is this case is consistent with market rates in published surveys by Altman Weil, a leading law firm consultant. Specifically, Altman Weil found a median hourly rate in 2005 of $195 for associates in the Middle Atlantic region (encompassing both Philadelphia and the District of Columbia) and a range up to $273 per hour at the 90th percentile. See Associate Hourly Billing Rates (March 10, 2006), reprinted from http://www.altmanweil.com/PracticeSpecialtiesRates/. The median rate for partners (shareholders) in employee benefits litigation was $305 per hour, *id.*, Practice Specialties and Hourly Rates (October 1, 2005),   A $200 rate in 2006 is only a 2.56% increase over the 2005 median for associates only.

(c)      The fees are consistent with market ranges in a 2004 Ohio bar association survey, downloads.ohiobar.org/conventions/convention2005/session508%20Economics%20of%20Law.

pdf, especially pages 26 and exhibit 27, especially after giving weight to increases from 2004 to

2006 (roughly 5% per year on average in the Ohio survey) and regional differences reflected in

Altman Weil data (Ex. A), showing an 8.33% higher rate in median associates' rates in the

Middle Atlantic region ($195) over the East North Central region covering Ohio ($180)).  The

Ohio survey showed median hourly associate rates in the comparable downtown Cleveland,

Cincinnati and Columbus areas of $200 - $235 per hour, ranging up to $ $334 - $359 at the 90[th]

percentile. See, Exhibit B (excerpt page 26).  It also shows that a $70 per hour paralegal rate is

less than the median rate for 5 years experience in Ohio, without adjustment for regional

differences, Exhibit B (Ex. 27).

 I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.

 Pursuant to 28 U.S.C. § 1746, I declare under
 penalty of perjury that the foregoing is true and
 correct.

Signed on:  February 16, 2007          s/ Sanford G. Rosenthal
 SANFORD G. ROSENTHAL, ESQUIRE
 (I.D. NO. 478737)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| ALLIED PROFESSIONAL SERVICES, INC a/k/a Allied Services | ) ) ) |
| Defendants. | ) ) |

CIVIL ACTION NO.
06-02167 (JDB)

**JENNINGS SIGMOND ATTORNEYS' FEES – FEBRUARY 2007**

Elizabeth A. Coleman, Esquire            EAC

| Date | Attorney | Task | Time |
|---|---|---|---|
| 2/5/07 | EAC | Preparation of Correspondence to Peggy Gilbert | 0.2 |
| 2/9/07 | EAC | Review of E-mail from Peggy Gilbert; Review of Delinquency Report | 0.2 |
| 2/12/07 | EAC | Preparation of Thomas Montemore Declaration | 0.3 |
| 2/13/07 | EAC | Continued Preparation of Montemore Declaration | 1.0 |
| 2/14/07 | EAC | Review and Revision of Montemore Declaration; Preparation of Correspondence to Tom Montemore; Preparation of Motion for Default 55(b); Calculation of Attorneys' Fees; Preparation of Sanford G. Rosenthal Declaration | 3.0 |
| | | **Total:** | **4.7** |

**February 2007 Summary:**
EAC  4.7 hrs  x  $200.00       =  $  940.00

Fees and Costs 12/06 through 1/07   =  $1,140.54
**Grand Total:**                     =  **$2,080.54**

179854-1


EXHIBIT

# Jennings Sigmond, P.C.
## Time And Expense Details

Report ID:  OT2025 - 9754
Tuesday, February 13, 2007

Printed By  MHT
Page  1

Beginning To End

| Client | Client Reporting Name | Matter | Matter Reporting Name | Billing Timekeeper |
|---|---|---|---|---|
| PTINTF | IUPAT Industry Pension Fund | 28564 | Allied Professional Services | Sigmond, Richard B. |

**Billed Time**

| Date | Timekeeper | Hours Worked | Hours On Bill | Rate | Amount Task | Activity | Narrative |
|---|---|---|---|---|---|---|---|
| 12/7/2006 | SMC | 0.40 | 0.40 | 200.00 | $80.00 | | Review of Documents Open File |
| 12/8/2006 | EAC | 1.60 | 1.60 | 200.00 | $320.00 | | Review of New File Preparation of Complaint |
| 12/11/2006 | EAC | 0.10 | 0.10 | 200.00 | $20.00 | | Preparation of Memo to Client Regarding Litigation Status Report |
| 12/26/2006 | CTM | 0.20 | 0.20 | 70.00 | $14.00 | | Review of Electronic Court Documents regarding Summons and Complaint |
| 12/26/2006 | EAC | 0.10 | 0.10 | 200.00 | $20.00 | | Review of Complaint and Summons from Court |
| 1/11/2007 | EAC | 0.10 | 0.10 | 200.00 | $20.00 | | Review of Return of Service |
| 1/31/2007 | EAC | 0.80 | 0.80 | 200.00 | $160.00 | | Preparation of request to Enter Default and Related Documents |

| Post Date | Status | Entry Date | Original Post Period | Original Post Year |
|---|---|---|---|---|
| 01/31/2007 | Current Period | 01/31/2007 | 1 | 2007 |

**Billed Time**

| | Totals | Hours Worked 3.30 | Hours On Bill 3.30 | | Amount Task $634.00 | | |
|---|---|---|---|---|---|---|---|

**Billed Expenses**

| Date | Amount | Exp Code | Narrative |
|---|---|---|---|
| 12/14/2006 | $350.00 | 7100 | Complaint |
| 12/18/2006 | $16.17 | COPY | Photocopies |
| 12/23/2006 | $15.92 | SD | Special Delivery |
| 12/27/2006 | $20.30 | COPY | Photocopies |
| 1/12/2007 | $0.21 | COPY | Photocopies |
| 1/18/2007 | $103.10 | 7100 | Service Fee |
| 1/31/2007 | $0.84 | COPY | Photocopies |

**Billed Expenses**

| | Totals | Amount $506.54 | | |
|---|---|---|---|---|

| | | Hours Worked | Hours To Bill | Fee Amount | Expense Amount | Total Amount |
|---|---|---|---|---|---|---|
| **Report Totals** | | 3.30 | 3.30 | $634.00 | $506.54 | $1,140.54 |

*** End Of Report ***